# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "Agreement") is entered into between **ARSHAM METAL INDUSTRIES, INC.**, a Texas corporation (the "Seller"), and **ICON METAL SOLUTIONS, LLC**, a Texas limited liability company, or assigns (the "Buyer").

Seller hereby agrees to convey to Buyer, and Buyer hereby agrees to purchase from Seller, the following described property upon the following terms and conditions:

1.   Property.  The property ("Property") consists of the following described Land and other property interests situated in Harris County, Texas:

1.1   Real Property.  The Land consists of (i) a tract of land located at 11280 Charles Road, Houston, Harris County, Texas, LT 36B FAIRVIEW GARDENS SEC 1 PAR R/P 4.3625 AC (HCAD 064-015-000-0036), as more particularly described on Exhibit "A" attached hereto and incorporated herein for all purposes (the "Land"), together with (a) all buildings, structures, fixtures and improvements situated on, in or under the Land (the "Improvements"), and (b) all of Seller's right, title and interest in and to the appurtenances pertaining to the Land (hereinafter collectively referred to as the "Appurtenant Property"), including, but not limited to, all right, title and interest of Seller in and to adjacent roads, rights-of-way, alleys, drainage facilities, easements and utility facilities and strips and gores between the described Land and abutting properties, if any.  The Land, Improvements, and Appurtenant Property are sometimes hereinafter referred to as the "Real Property".

1.2   Personal Property.  Except for the tangible and intangible personal property listed on Schedule 1.2(a) attached hereto (the "Excluded Personal Property"), all personal property set forth on Schedule 1.2(b) attached hereto (the "Scheduled Personal Property"), together with all of Seller's right, title and interest in any personal property owned by Seller as of the date hereof and all of Seller's right, title and interest in any personal property owned by Seller on the date of Closing, including, without limitation, all inventory, furniture, furnishings, fixtures, fittings, appliances, apparatus, equipment, tools, machinery, maintenance supplies, heating, ventilating, air-conditioning, incinerating, lighting, plumbing and electrical fixtures, hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment, contract rights, claims, systems, names, "doing business as" names, goodwill, trademarks, websites, domain names, e-commerce names, social media accounts, email addresses, telephone numbers, facsimile numbers, logos, customer information, vendor information, books, records, files and other items of tangible and intangible personal property (collectively hereinafter referred to as the "Personal Property").

1.3   Licenses and Permits.  To the extent assignable by Seller to Buyer all of Seller's right, title and interest in and to (i) licenses, permits, certificates of occupancy, or similar documents relating to the Real Property and Personal Property, and (ii) plans, drawings, specifications, surveys, engineering reports and other technical descriptions of the Real Property, if any (collectively, the "Licenses and Permits").

# EXHIBIT 1

Notwithstanding anything herein to the contrary, the Agreement described herein is subject to the approval by the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") of the sale of the Property to Buyer (the "Bankruptcy Court Approval Date").

2.     Earnest Money.  At the time this Agreement is fully executed by Buyer and Seller, Seller shall cause this Agreement to be deposited with The Accurate Group of Texas, LLC (the "Title Company"), Attention:  Amy K. Grunert (the "Escrow Agent").  Within five (5) business days following the Effective Date of this Agreement, Buyer shall deposit with the Title Company the sum of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00), as earnest money (the "Earnest Money"). The Title Company shall invest the Earnest Money in an interest-bearing account and all interest earned thereon shall be deemed part of the Earnest Money.  At the Closing of this sale any cash held by the Title Company as the Earnest Money shall be applied towards the Purchase Price to be paid by Buyer hereunder.  If this Agreement is terminated in accordance with the terms and conditions hereof, the Earnest Money shall be paid as provided herein.  If Buyer shall fail to timely deposit any portion of the Earnest Money as required hereunder, then this Agreement shall terminate at Seller's option, which such option Seller may exercise by delivering written notice of the same to Buyer at any time prior to Buyer delivering such Earnest Money.

If this Agreement is terminated pursuant to a right of termination in this Agreement and such provision calls for the Earnest Money to be returned to Buyer (in addition to any other sums due in accordance herein), One Hundred and No/100 Dollars ($100.00) of the Earnest Money (the "Independent Consideration") shall be delivered to and retained by Seller as independent consideration for Seller's execution and delivery of this Agreement to the Title Company and Buyer's right to terminate this Agreement as set forth herein.   The Independent Consideration is in addition to and independent of any other consideration or payment provided in this Agreement, is nonrefundable to Buyer in all circumstances, and shall be retained by Seller notwithstanding any other provision of this Agreement to the contrary, if any.

3.     Purchase Price.  The total purchase price (the "Purchase Price") for the sale and purchase of the Property is TWO MILLION NINE HUNDRED THOUSAND and No/100 Dollars ($2,900,000.00). The Purchase Price shall be payable by Buyer in good funds.  The Purchase Price is allocated as follows: $1,650,000.00 for the sale and purchase of the Real Property; and $1,250,000.00 for the sale and purchase of the remainder of the Property. As used herein the term "good funds" shall mean (a) cash or wire transfers, (b) cashier's check, (c) certified check, (d) teller's check, or (e) any other instrument which is the functional equivalent of a cashier's, certified or teller's check.

4.     Documents Pertaining to Property.  The following steps shall be taken prior to Closing by Seller or Buyer, as specified below:

4.1     Title Insurance Commitment and Survey.

4.1.1   Buyer acknowledges receipt of the most recent existing survey of the Property in Seller's possession or control (the "Survey").

4.1.2   Within five (5) days after the Effective Date of this Agreement, Buyer shall use reasonable business efforts to cause to be delivered to Buyer and Seller, a commitment for title insurance (the "<u>Title Commitment</u>") issued by the Title Company for the Land showing all matters which may affect title to such Land together with copies of all documents constituting exceptions under the Title Commitment (collectively, the "<u>Title Documents</u>"); provided that the Title Company's failure to deliver the Title Commitment within the five (5) day period described above shall not be deemed a default by Buyer hereunder.

4.2   <u>Information to Be Supplied to Buyer</u>.  Within three business days (3) days after the Effective Date of this Agreement, Seller shall provide to Buyer:

4.2.1   The following information (the "<u>Property Information</u>") to the extent that it relates to the Property, currently exists, and is reasonably within Seller's possession and control:

4.2.2   A copy of property tax statements for the Real Property (which is currently assessed together with the adjacent land for real property taxes) for the most recent two (2) tax years.

4.2.3   To the extent it currently exists, a copy all: soil tests, environmental reports (including Phase I environmental reports), environmental site assessments, and hazardous material reports; traffic studies; building plans and site plans; a copy of all leases, license agreements, contracts, maintenance agreements and other agreements related to the ownership, operation, maintenance, or use of the Property or any part thereof; warranties and guaranties; maps, plats, and surveys; private easements and restrictions; permits; licenses; and certificates of occupancy; appraisal reports; topographical reports, topographical information, and topographical studies; engineering reports; utility agreements; flood plain maps; zoning letters, plans and correspondence from and communication with any governmental authority, including, without limitation, the City of Houston, Harris County, Texas, the Texas Department of Transportation and all other governmental and quasi-governmental authorities in connection with access, ingress and egress to and from the Property; and other similar matters relating to the Property.

4.2.4   The following information (the "<u>Business Information</u>" and together with the Property Information, the "<u>Information</u>") to the extent it currently exists, and is reasonably within Seller's possession and control: a copy of all: Quickbook files (to include electronic Quickbook files with appropriate username(s) and password(s)), equipment manuals, employee information,

equipment information, depreciation schedules, all contracts (not limited to energy and oxygen contracts),  audited financial statements for the most recent three (3) fiscal years, all permits, all licenses, all human resources files, environmental health and safety plans, production information, and all information material to Seller's operation of its business, including without limitation, all corporate files in paper or electronic form to remain to at the Real Property at Closing.

Except to the extent included in the representations and warranties of Seller as set forth in this Agreement, including without limitation the representations and warranties set forth in Section 12.1, Seller does not represent or warrant the truth, accuracy, completeness, or correctness of the Information, <u>provided</u> Seller represents and warrants to Buyer that Seller has no actual knowledge that any of the Information is untrue, inaccurate, incomplete, or incorrect.  If Buyer terminates this Agreement for any reason whatsoever, Buyer shall concurrently therewith return to Seller all Information and neither Buyer nor its agents, employees, or representatives may retain any copies thereof.

4.3   <u>Objections</u>.  Buyer shall have until 5:00 p.m., Central Time, on the date of the expiration of the Feasibility Period (as defined below) within which to approve or disapprove the Title Commitment, Title Documents, and Survey, such approvals or disapprovals to be within Buyer's sole and exclusive discretion.  If Buyer fails or refuses to disapprove timely any such item by written notice to Seller within such period, Buyer shall be deemed irrevocably and conclusively to have accepted such item in its then-current form.  Any item contained in the Title Commitment, Title Documents, or Survey to which Buyer does not object in writing prior to the expiration of the Feasibility Period or that Seller does not agree in writing to cure shall be deemed a "<u>Permitted Exception</u>", <u>provided</u> in no event shall any Texas Department of Insurance or Title Company exceptions be deemed Permitted Exceptions hereunder if they do not relate to a specifically recorded instrument or document.  If Buyer delivers to Seller written objections to the Title Commitment, Title Documents, or Survey, Seller may elect to cure such objections, but assumes no contractual or legal obligation to do so, nor any obligation to expend any money, file suit, or delay Closing.  Notwithstanding anything herein to the contrary, in no event shall any exceptions or special requirements appearing on Schedule C of the Title Commitment and which are in the nature of monetary liens of a definite ascertainable amount, including, without limitation, all voluntary monetary liens and encumbrances arising by, through, or under Seller, or which pertain to Seller's existence, good standing and due authority to undertake the transaction contemplated by this Agreement (collectively, "<u>Mandatory Cure Items</u>") be deemed to be Permitted Exceptions, it being expressly understood and agreed that Seller, at its sole cost and expense, shall be responsible for discharging or otherwise removing to Buyer's and the Title Company's satisfaction any such Mandatory Cure Items on or before the Closing Date, regardless of whether Buyer objects to any such Mandatory Cure Items. If by the expiration of the Feasibility Period, Seller has not cured all objections of which Buyer gave written notice to Seller prior to the expiration of the Feasibility Period, then Buyer, as its sole and exclusive

remedy, shall either (a) terminate this Agreement prior to the expiration of the Feasibility Period by providing to Seller written notice thereof whereupon Seller shall receive the Earnest Money (provided; however, if Buyer shall terminate this Agreement on account of Seller's failure or refusal to cure an objection which constitutes a Material Title Matter (as defined herein), Buyer shall receive a refund of the Earnest Money and Seller shall retain the Independent Consideration), or (b) waive in writing the objections and accept such title as reflected in the Title Commitment, Title Documents, and Survey (with each uncured objection being also deemed a Permitted Exception).  Buyer's failure to elect either remedy in writing prior to the expiration of the Feasibility Period shall be deemed to constitute Buyer's irrevocable and conclusive election to accept the Title Commitment, Title Documents, and Survey in their then-current form and close the purchase of the Property subject to any such matters to which Buyer objected being Permitted Exceptions, irrevocably and conclusively waiving its right to terminate this Agreement pursuant to this Section.  As used herein, a "Material Title Matter" shall be a matter identified in Buyer's written objections that: (i) was not shown on the Survey or otherwise disclosed to Buyer prior to the Effective Date; and (ii) Buyer reasonably believes may have a material and adverse impact on (a) the continued use of the Property as maintained and operated by Seller, or (b) the fair market value of the Property as reasonably determined by Buyer.

5.   Due Diligence Reviews.

5.1   General Feasibility Study.  Subject to the limitations and requirements in this Agreement, Buyer and its agents shall be permitted to make a full and complete inspection of the Property, including soil conditions, availability of utilities and the environmental condition of the Property.  All inspections, assessments, tests, examinations, and studies of the Property (collectively, the "Tests") shall be conducted by or on behalf of Buyer in a good and workmanlike manner and in conformance with all applicable governmental and industry standards and all such Tests must be performed by qualified and insured contractors.  Buyer may perform a geotechnical survey of the Land, including, without limitation, a Phase II Environmental Assessment).  Buyer shall furnish to Seller prior to the commencement of each Test which Buyer desires to conduct on the Property: (a) a list of Buyer's agents who will conduct such Test, and (b) a description of the Tests which each such agent will perform at or about the Property.  All third-party reports shall be paid for by Buyer at Buyer's sole cost and expense, and Buyer covenants and agrees to deliver to Seller a copy of all such reports promptly upon completion thereof (unless instructed otherwise by Seller), and Seller shall have the right to use the same for its own benefit without Buyer's consent or payment any of any sum. Buyer covenants and agrees to furnish to Seller promptly upon completion thereof, and at no cost or expense to Seller, a legible and complete copy of any and all plans, documents, studies, reports and other data furnished to or obtained by Buyer in connection with or pertaining to the Property (unless instructed otherwise by Seller), including, without limitation, all engineering plans and studies, utility studies and reports, and environmental inspection reports, without, however, including any privileged or confidential information regarding Buyer and the

delivery thereof to Seller shall be a condition precedent to the refund to Buyer of the Earnest Money as applicable hereunder. Any and all items furnished by Buyer to Seller shall be delivered to and accepted by Seller without any representation or warranty of any nature whatsoever by Buyer as to the truth, accuracy, completeness, or correctness thereof. Buyer agrees that if Seller or Buyer terminates this Agreement as set forth in this Agreement, Buyer will (i) restore the Property to substantially the same condition which existed prior to any Tests or other activities of Buyer thereon; (ii) be responsible for and pay or bond around any and all liens by contractors, subcontractors, materialmen, or laborers performing the Tests or any other work for Buyer on or related to the Property; and (iii) pay and/or reimburse Seller for the payment of any actual out-of-pocket expenses (including reasonable attorneys' fees and court costs) incurred by Seller in enforcing subsection (i) or (ii) above. The rights of Buyer to enter on and Test the Property shall cease upon the termination of this Agreement. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, BUYER HEREBY COVENANTS AND AGREES TO INDEMNIFY, DEFEND, AND HOLD SELLER HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, COURT COSTS AND REASONABLE ATTORNEYS' FEES) ARISING OUT OF, RESULTING FROM, IN CONNECTION WITH, OR RELATING TO BUYER'S TESTS (AS DEFINED ABOVE) OF THE PROPERTY, EXCEPT TO THE EXTENT ANY OF THE FOREGOING IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER, ITS AGENTS OR EMPLOYEES.** Notwithstanding the foregoing, in no event shall Buyer be liable for and the foregoing indemnity, defense, and hold harmless obligation in this Section shall not apply to or include any claims, demands, liabilities, costs or expenses (including, without limitation, court costs and reasonable attorneys' fees) arising out of, resulting from, relating to, or in connection with Buyer's or Buyer's agents' discovery or detection of any condition or defect existing on the Property prior to Buyer's or Buyer's agents' Tests thereon. Buyer's obligations in this Section shall be Surviving Obligations.

5.2     <u>Feasibility Period</u>. Buyer shall have a period beginning on the Effective Date and expiring at 5:00 p.m., Central Time, through May 2, 2019 (the "<u>Feasibility Period</u>") to perform the Tests and inspect the Property, including, without limitation: (a) the nature, quality and condition of the Land, including, without limitation, the water, soil, geology, flora and fauna, and the suitability thereof, and the Land, including the existence of any environmental hazards or toxic substances or conditions; (b) the suitability of the Property for any and all activities and uses which Buyer may or wish to conduct thereon; (c) the manner of construction and condition and state of repair or lack of repair of Improvements, if any, located thereon; (d) the compliance of or by the Property or its operation with any laws, orders, statutes, rules, ordinances, or regulations of any applicable governmental authority or body; and (e) the presence of any endangered or threatened species on the Property, as well as the suitability of the Property as a habitat for any of those species.

5.3    <u>Right to Terminate During the Feasibility Period</u>. In the event Buyer, in its sole and absolute discretion, determines that the Property is not suitable for its purposes, Buyer may terminate this Agreement by delivering to Seller timely written notice of termination prior to the expiration of the Feasibility Period.  Upon timely termination of this Agreement by Buyer prior to the expiration of the Feasibility Period, this Agreement shall terminate and the Title Company shall deliver the Earnest Money to Seller (<u>provided</u>; however, if Buyer shall terminate this Agreement on account of a Material Environmental Matter (as defined herein), Buyer shall receive a refund of the Earnest Money, Seller shall retain the Independent Consideration, and Seller shall reimburse Buyer its commercially reasonable and actual expenses incurred in connection with performing the proposed transactions contemplated under this Agreement (including, without limitation, all due diligence costs and expenses and all attorneys' fees incurred prior to the date of termination), subject to Bankruptcy Court approval of such expenses as commercially reasonable ("<u>Buyer's Expenses</u>") whereupon neither party hereto shall have any further rights, duties, or obligations hereunder except those that expressly survive the termination of this Agreement.  If Buyer does not terminate timely this Agreement prior to the expiration of the Feasibility Period, Buyer shall be deemed irrevocably and conclusively to have accepted the Title Commitment, Title Documents, and Survey, in their then-current form. Notwithstanding the provisions of this Section 5.3, Buyer's failure to terminate based upon a Material Environmental Matter during the Feasibility Period shall not waive any other rights of Buyer to terminate this Agreement as provided herein including, without limitation, Buyer's right to terminate based upon Sellers breach of any representation or warranty set forth in Section 12.1, Buyer's right to terminate based upon Seller's failure to perform any covenant or obligations hereunder, and Buyer's right to terminate as provided under Section 13.1 or Section 39 of this Agreement.  As used herein, a "<u>Material Environmental Matter</u>" means (A) a Recognized Environmental Condition, a Historical Recognized Environmental Condition or a Controlled Recognized Environmental Condition (as such terms are defined in ASTM International E1527-13) that is identified in any Phase I Environmental Site Assessment of the Property obtained by Buyer during the Feasibility Period that: (i) was not disclosed to Buyer prior to the Effective Date and (ii) the existence of which materially and adversely affects the continued use or fair market value of the Property as maintained and operated by Seller, as reasonably determined by Buyer or (B) an environmental condition on the Real Property requiring remediation pursuant to federal, state, or local laws, ordinances, or regulations, as reasonably determined by Buyer's environmental consultant during the Feasibility Period and which materially and adversely affects the continued use or fair market value of the Property as maintained and operated by Seller, as reasonably determined by Buyer.

6.    <u>Closing</u>.

6.1    <u>Date of Closing</u>.  The sale of the Property shall be closed (the "<u>Closing</u>") at the offices of the Title Company on the date that is seven (7) days following approval

of such sale by the Bankruptcy Court, or on such earlier date as may be agreed upon by Seller and Buyer (the "Closing Date").

6.2     Successful Bidder.  In the event that Buyer is not the Successful Bidder, as defined in the Sale Motion, the Earnest Money shall be refunded to the Buyer (less the Independent Consideration which shall be paid to Seller), and Buyer shall be entitled to the sum of Eighty-Seven Thousand and No/100 Dollars ($87,000.00) as a "break-up fee" (the "Break-Up Fee") and Buyer's Expenses.

7.     Documents to be Delivered at Closing.  The following shall be delivered at Closing:

7.1     Purchase Price.  Buyer shall cause to be delivered to Seller the Purchase Price, in good funds, as described in Section 3, above, less the Earnest Money and subject to any adjustment provided herein.

7.2     Deed.  Seller shall furnish at Seller's expense a special warranty deed executed and acknowledged by Seller (the "Deed") in the form attached hereto as Exhibit "B". The Deed shall convey good and indefeasible fee simple title to the Real Property, free and clear of all restrictions, conditions, easements, liens, and other encumbrances, except for the Permitted Exceptions as described in Section 4 above, and such other items disclosed to Buyer and approved by Buyer in accordance with the terms of this Agreement.

7.3     Title Policy.  Buyer shall cause the Title Company to furnish to Buyer, at Seller's expense, a standard form Owner's Policy of Title Insurance issued by Title Company in the form prescribed by the Texas Department of Insurance issued by an underwriter selected by Buyer.  The policy shall be in the amount of the total Purchase Price of the Real Property and shall guarantee that Buyer's title to the Real Property is good and indefeasible subject only to the following exceptions:

7.3.1     The Permitted Exceptions as described in Section 4 above, and such other items disclosed to Buyer and approved by Buyer in accordance with the terms of this Agreement.

7.3.2     Any taxes not yet due for the year in which the Closing occurs.

7.3.3     Government rights of police power or eminent domain unless notice of the exercise of such right appears in the public records as of the date hereof and the consequences of any law, ordinance or governmental regulation, including but not limited to building and zoning ordinances.

7.3.4     All other standard printed exceptions set out on a standard form Owner's Policy of Title Insurance issued by Title Company in the form prescribed by the Texas Department of Insurance without any extended coverages.

7.3.5     Buyer may, at Buyer's option and expense, cause the Title Company to delete from the Title Policy the exceptions as to discrepancies in areas or

boundaries, encroachments or overlapping of improvements, except "shortages in area". If the Survey is accepted by the Title Agent, Seller shall execute any survey affidavit with respect to the Survey reasonably requested by the Title Company to allow the Title Company to amend the survey exception in the Owner Title Policy on the Property issued at Closing to read "shortages in area".

7.4    <u>Assignment of the Contracts, Licenses and Permits</u>.  Seller shall execute and deliver to Buyer an Assignment and Assumption in substantially the form attached hereto as <u>Exhibit "C"</u> assign to Buyer all of its right, title and interest in the Contracts, Licenses and Permits listed in <u>Schedule 7.4</u> (the "<u>Assumed Contracts</u>") and Buyer shall assume all of the obligations under the Assumed Contracts from and after the Closing Date.  Buyer will designate at its sole discretion prior to the bid deadline its list of Assumed Contracts to be listed on <u>Schedule 7.4.</u>

7.5    <u>Bill of Sale</u>.  Seller shall execute and deliver to Buyer a Bill of Sale in substantially the same form attached hereto as <u>Exhibit "D"</u> conveying the Scheduled Personal Property to Buyer free and clear of all restrictions, conditions, easements, liens, and other encumbrances, together with the remainder of the Personal Property.

7.6    <u>Vehicles Titles</u>.  All titles to any vehicles included as Personal Property, if any, free and clear of all restrictions, conditions, easements, liens, and other encumbrances, except the Permitted Exceptions as described in Section 4, above.

7.7    <u>Foreign Person Affidavit</u>.  At Closing, Seller shall deliver to Buyer an affidavit certifying the fact that Seller is not a "Foreign Person" as that term is defined in the Internal Revenue Code of 1986, as amended (the "<u>Code</u>").

7.8    <u>Authority to Execute Documents</u>.  Seller and Buyer shall each deliver to the other and the Title Company documentation sufficient to evidence that each has the requisite authority to execute documents for Closing this sale.

7.9    <u>Records and Other Documents</u>.  Originals (or if originals are not in Seller's possession, copies) of, and electronic files of (as applicable) (i) transferable warranties, guaranties which Buyer will assume or to which it would be a beneficiary pursuant to an agreement, (ii) operating manuals in Seller's possession or subject to Seller's control issued by manufacturers or suppliers with respect to Personal Property to be acquired and all other documents pertaining to the continued operation or maintenance of the Property, and (iii) all books, records and files of Seller to the extent related to the Property and not previously delivered to Buyer, including, without limitation, sales and service records, books of account, invoices, inventory records, accounting records, environmental records and studies, maintenance records, cost and pricing information, supplier and vender lists, business plans, catalogues, quality control records and manuals, blueprints, research and development files, and patent and trademark files.

7.10 <u>Keys and Passwords</u>.  All keys used in connection with the operation of the Property and all log-in or password information used for software or electronic accounts or access shall be delivered to Buyer.

7.11 <u>Property</u>.  Seller shall deliver possession of the Property at Closing, subject to the Permitted Exceptions.

7.12 <u>Other Matters</u>.  Seller and Buyer shall each deliver any such other matters as may be required herein or reasonably required by the Title Company.

7.13 <u>Sale Order</u>. The Sale Order, in form and substance reasonably acceptable to Buyer and Seller, shall have been entered by the Bankruptcy Court prior to the Closing and such order shall be a final order and in full force and effect.

8.  <u>Prorations</u>.  Seller and Buyer agree to prorate the following items relating to the operations of the Property effective, as of 11:59 p.m., Central Time (the "<u>Proration Time</u>"), on the day prior to the date the Closing occurs (collectively, the "<u>Proration Items</u>"):

8.1 <u>Real Estate Taxes and Assessments</u>.  Ad valorem taxes and assessments payable for the calendar year in which Closing occurs shall be prorated as of the Proration Time such that Seller will be charged and credited for the amounts of all of such ad valorem taxes and assessments relating to the period up to and including the Proration Time, and Buyer will be charged and credited for all of such ad valorem taxes and assessments relating to the period after the Proration Time.  If the current year's ad valorem taxes are not known as of Closing, the parties shall, upon Closing, pro rate the current year's ad valorem taxes based on the previous year's tax rate applied against the most recent assessed valuation.  Any and all expenses incurred or to be incurred in connection with any real estate tax appeals that are pending at the time of Closing shall be prorated in the same manner as ad valorem taxes set forth above.

8.2 <u>Utilities and Other Operating Expenses</u>.  All utility charges payable by Seller, including, without limitation, electricity, gas, water charges and sewer charges and other operating expenses with respect to the Property shall be prorated between Seller and Buyer as of the Proration Time.  If there are meters on the Real Property, Seller will cause readings of all said meters to be performed not more than five (5) days prior to the Closing Date, and an estimated per diem adjustment shall be made for the days between the meter reading date and the Closing Date based on the most recent meter reading.  Buyer shall take all reasonable steps necessary to effectuate the transfer of all utilities to its name as of the Closing Date, and where necessary, post deposits with the utility companies, <u>provided</u>, Seller shall reasonably cooperate with such efforts.  Seller shall be entitled to recover any and all deposits held by any utility company as of the Closing Date.

8.3 <u>Other Costs</u>.  Each party shall be responsible for paying its own attorneys' fees associated with negotiating, preparing, and closing the transaction contemplated by this Agreement. Seller is responsible for the cost of the basic premium for the Title

Policy, one-half (1/2) of any escrow fees assessed by the Title Company, transfer taxes, mortgage taxes, and mortgage or transfer stamps. Buyer is responsible for one-half (1/2) of any escrow fees assessed by the Title Company, the cost for the amendment to the standard survey exception on the Title Policy and any title endorsements, any Mortgagee Title Policies, and any filing fees for the conveyance documents. All other closing expenses shall be allocated between the parties in the customary manner for sales of real property similar in nature to the Property and located in Harris County, Texas.

8.4 <u>Closing Statement Adjustments</u>.  The proration shall be paid at Closing by Buyer to Seller (if the prorations result in a net credit to Seller) or by Seller to Buyer (if the prorations result in a net credit to Buyer) by increasing or reducing the cash to be delivered by Buyer in payment of the Purchase Price at the Closing.  If the actual amounts of the Proration Items are not known as of the Closing, the prorations will be made at Closing on the basis of the best evidence then available and shall be deemed final for all purposes hereunder  No prorations will be made in relation to insurance premiums, and Seller's insurance policies will not be assigned to Buyer.

8.5 <u>Ash Removal; Equipment Leases</u>.

8.5.1 Seller stipulates that there is certain ash stored in a structure located on the Real Property that requires removal (the "<u>Ash</u>"). Prior to Closing Seller shall, at its sole cost and expense, remove the Ash from the Real Property.

8.5.2 Seller shall be responsible for all Cure Costs related to any Assumed Contracts.

8.6 <u>Survival</u>.  The obligations of each party under this Section 8 shall be Surviving Obligations.

9. <u>Allocation of Purchase Price</u>.  The parties agree that this transaction will be treated as an asset acquisition for tax purposes.  Within thirty (30) days after the Closing Date, Buyer shall prepare and provide a proposed allocation of the Purchase Price among the Property (the "<u>Purchase Price Allocation</u>") to the Seller.  Such proposed Purchase Price Allocation shall be in accordance with Section 1060 of the Code and final and binding on the Parties unless, within thirty (30) calendar days after Buyer provides such proposed Purchase Price Allocation, Seller notifies Buyer of their disagreement with any item in such proposed allocation.  In the event of such notification, Seller and Buyer shall negotiate in good faith to resolve such dispute; provided, however, that if Seller and Buyer cannot resolve such dispute within thirty (30) calendar days then they shall be entitled to file separate allocations.  Any allocation of the Purchase Price agreed to pursuant to this Section shall be binding on Buyer and Seller for all tax reporting purposes except that neither party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any tax audit, claim, or similar proceedings.  The Purchase Price Allocation shall be for tax purposes only, and the Purchase Price Allocation shall not have any effect on any other distribution or disbursement of monies to secured or unsecured creditors in the bankruptcy proceeding described herein.

10. <u>Continued Operation of the Property</u>.  Seller shall, from the Effective Date to Closing, (a) operate and maintain the Property in substantially the same manner as it is now operated and maintained, reasonable and ordinary wear and tear excepted, and as required by any applicable contract or by applicable law; (b) conduct its business in substantially the same manner as it is now conducted and as required by applicable law and maintain its books and records in the usual, regular and ordinary manner; (c) not merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence; (d) not sell, lease, assign, transfer or otherwise dispose of any material assets or properties that would be Property at Closing other than inventory sold, consumed or disposed of in the regular manner; (e) not enter into any material contracts; (f) not assume, assign, reject, terminate or materially amend any Assumed Contract; (g) fail to keep in full force and effect present insurance policies, binders, contracts, instruments or other comparable insurance benefitting the Property; and (h) not take any action that would knowingly result in a failure to comply in all material respects with all governmental laws rules or regulations applicable to the Property.

11. <u>Casualty and Condemnation</u>.

11.1 <u>Casualty</u>. In the event all or any portion of the Property is damaged to a Material Extent (as defined herein) by fire or any other casualty between the date hereof and the Closing, Buyer, as its sole and exclusive remedy, shall have the right to either (a) terminate this Agreement by giving written notice to Seller, in which event this Agreement shall be terminated, the Earnest Money shall be refunded to Buyer (less the Independent Consideration which shall be paid to Seller) and neither party shall have any further obligations hereunder other than the Surviving Obligations, or (b) consummate Closing without any reduction of the Purchase Price in accordance with the terms of this Agreement, the net proceeds of any insurance collected by Seller prior to Closing and the amount of any applicable deductible under the insurance policy(ies) maintained by Seller with respect to the Property as of the date hereof will be paid to Buyer at Closing, and all unpaid claims and rights of Seller under such insurance that have not been collected by the time of Closing shall be assigned to Buyer at Closing.  In the event insurance claims or proceeds are not assignable to Buyer for any reason, including due to circumstances related to the bankruptcy proceeding described herein, Seller will work with Buyer to negotiate a cash payment of such proceeds from Seller to Buyer post-Closing and will work to secure any order from the Bankruptcy Court necessary to approve or facilitate this cash payment. In the event such assignment cannot be made, Buyer shall have the right to terminate this Agreement and receive the amounts provided in Section 6.3 above.  As used herein, "Material Extent" means any loss or damage to the Property caused by fire or other casualty, the cost to repair of which is greater than five percent (5%) of the Purchase Price, as reasonably determined by agreement of Seller and Buyer.

11.2 <u>Condemnation</u>. In the event of any taking or condemnation for any public or quasi-public purpose or use by any competent authority in appropriate proceedings or by any right of eminent domain of all or any portion of the Property (i.e. loss of access

or a portion of the improvements so that operation of the Property is materially interfered with as determined by Buyer in its reasonable discretion) between the date hereof and the Closing, Buyer shall have the right to either (a) terminate this Agreement, in which event the Earnest Money shall be refunded to Buyer (less the Independent Consideration which shall be paid to Seller) and neither Buyer nor Seller shall have any further rights or liabilities hereunder other than the Surviving Obligations, or (b) proceed with Closing in accordance with this Agreement, in which event, Seller shall be relieved of its duty to convey title to the portion so taken or condemned, and Buyer will be entitled to receive all proceeds of any such taking or condemnation; provided Seller will make no adjustment or settlement of such condition without Buyer's consent and will take at Closing all action necessary to assign its entire interest in any such award to Buyer. In the event such assignment cannot be made, Buyer shall have the right to terminate this Agreement and receive the amounts provided in Section 6.3 above.

12.     Representation and Warranties.

12.1    Seller Representation and Warranties.  Seller represents and warrants that, as of the Effective Date:

12.1.1   Authority of Seller. Seller is a validly existing business entity duly formed and authorized to do all things required of it under the terms of this Agreement. The execution and delivery of this Agreement and the performance of Seller's obligations hereunder have been duly authorized by all necessary action on the part of Seller, and this Agreement constitutes the legal, valid and binding obligation of Seller.

12.1.2   No Violations.   The execution by Seller of this Agreement and the consummation by Seller of the transaction contemplated hereby do not result in and at Closing will not result in, a breach of any of the terms or provisions of, or constitute a default or a condition which upon notice or lapse of time or both will ripen into a default under any indenture agreement, instrument or obligation which Seller is a party to and by which the Property or any portion thereof is bound.

12.1.3   No Condemnation.  Other than as set forth in the records to be provided by Seller to Buyer pursuant to the terms of this Agreement Seller has received no written notices from a governmental or quasi-governmental agency authorized to carry out condemnation matters relating to the Property or informing the Seller of condemnation proceedings that may be pending against the Property.

12.1.4   No Litigation.  Other than as set forth in the records to be provided by Seller to Buyer pursuant to the terms of this Agreement Seller has not received written notice of any pending or threatened lawsuits by adjoining landowners or others affecting the Property.

12.1.5 <u>Title</u>.  Seller has good and indefeasible title to the Real Property and Scheduled Personal Property, free and clear of all liens and encumbrances except those exceptions Seller is obligated to cause to be released at or prior to Closing.

12.1.6 <u>Liens</u>.  Other than the Permitted Exceptions, there will be no unrecorded liens, assessments, or security interests against the Property upon the Closing Date which will not be satisfied out of the Purchase Price of the Property.

12.1.7 <u>Leases</u>.  There are no leases covering any part of the Property and no other person or entity other than Seller currently owns or has any legal or equitable interest in the Property.  No other person or entity other than Buyer has or will have the right to acquire the Property and Buyer shall have full right to possession of the Property after Closing.

12.1.8 <u>Compliance</u>.  To Seller's knowledge, Seller has conducted its business and its operations in material compliance with and will on the Closing Date be in material compliance with all applicable laws, regulations, ordinances, rules and requirements as to the Property. Seller has not received any written notice that the Property is in violation of any private deed restriction or any law, ordinance or regulation, or any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located including, without limitation, those relating to building, zoning, platting, environmental matters and hazardous waste, and no claim, action, suit or proceeding, to Seller's actual knowledge, is pending or threatened against or affecting Seller or affecting the Property, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or entity wherever located, with respect to the Property. All licenses, permits, certificates and other approvals required for the Seller to conduct its business and its operations as presently conducted have been obtained by Seller and are valid and in full force and effect.

12.1.9 <u>Taxes</u>.  All taxes payable with respect to the operation, ownership or control of the Property which are allocable to the period ending on the Closing Date, and all prior periods, shall be or have been paid by Seller, and Seller shall be responsible for the timely filing of all returns or other documents required by any taxing authority claiming jurisdiction with respect to any such taxes.

12.1.10 <u>Preferential Rights</u>.  There are no rights of first refusal, preferential rights to purchase, or other options or rights existing in favor of any party granting to such party the right to purchase all or any portion of the Property.

12.1.11 <u>Bankruptcy Filings</u>.  There are no material misrepresentations in any document filed by Seller with the Bankruptcy Court.

12.1.12 <u>Financial Statements</u>. All financial data provided to Buyer by Seller is true, correct, and complete in all material respects, including without limitation all financial statements of Seller included in the virtual data room made available to Buyer.

12.1.13 <u>Inventory</u>. Seller warrants to provide to Buyer at Closing, as part of the Property, One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) of inventory, valued based upon the lower of cost or market method. At Closing, Buyer will pay to Seller any inventory value over One Hundred Twenty-Five Thousand ($125,000.00) as determined using the lower of cost or market valuation method. Seller will provide a credit against the Purchase Price at Closing for any shortage of inventory from the required One Hundred Twenty-Five Thousand ($125,000.00) delivery of inventory at Closing.

12.1.14 <u>Limitation of Seller's Representations and Warranties</u>. For the purposes of this Agreement, the "best of Seller's knowledge", "actual knowledge of Seller" and words of similar effect shall mean the present actual (as opposed to constructive or imputed) knowledge, as of the Effective Date, solely of Sheldon Arsham or Jeff Arsham without any independent investigation or inquiry whatsoever; provided, Seller represents and warrants to Buyer that Sheldon Arsham, in his capacity as President of Seller, and Jeff Arsham, in his capacity as chief operating officer of Seller, is each familiar with and has knowledge of the Property. No provision herein, however, shall give rise to any personal liability to the foregoing named individuals. In the event that any of Seller's representations or warranties in this Agreement become untrue or materially inaccurate between the Effective Date and the Closing Date, Seller shall promptly notify Buyer of same before Closing, whereupon Buyer shall have, as its sole and exclusive alternative remedies, the right in its sole discretion to either (i) terminate this Agreement within five (5) days of receipt of notice from Seller of such fact by giving written notice of termination to Seller within said period, whereupon the Earnest Money (less the Independent Consideration which shall be paid to Seller) and Buyer's Expenses shall be promptly paid to Buyer and the parties shall have no further obligations hereunder other than the Surviving Obligations, (ii) waive any claim or cause of action relating to such fact and proceed to Closing or (iii) extend the Closing for a period of time not to exceed ten (10) days in order that Seller may attempt to cure the default.

12.2 <u>Buyer Representation and Warranties.</u> Buyer makes the following representations and warranties as of the Effective Date, all of which shall be true as of the date of Closing and all of which shall be Surviving Obligations:

12.2.1 <u>Authority of Buyer</u>. Buyer is a validly existing business entity duly formed and authorized to do all things required of it under the terms of this Agreement. The execution and delivery of this Agreement and the performance of Buyer's obligations hereunder have been duly authorized

by all necessary action on the part of Buyer, and this Agreement constitutes the legal, valid and binding obligation of Buyer.

12.2.2  <u>No Violations</u>.  The consummation by Buyer of the transactions contemplated hereby will not violate any judgment, order, injunction, decree, regulation or ruling of any court or Authority or conflict with, result in a breach of, or constitute a default under the organizational documents of Buyer, any note or other evidence of indebtedness, any mortgage, deed of trust or indenture, or any lease or other material agreement or instrument to which Buyer is a party or by which it is bound.

12.2.3  <u>Anti-Terrorism Laws</u>.  Buyer is not and shall not be, and, after making due inquiry, no person or entity ("<u>Person</u>") who owns a controlling interest in or otherwise controls Buyer is or shall be, (i) listed on the Specially Designated Nationals and Blocked Persons List (the "<u>SDN List</u>") maintained by the Office of Foreign Assets Control ("<u>OFAC</u>"), Department of the Treasury, and/or on any other similar list ("Other Lists" and, collectively with the SDN List, the "<u>Lists</u>") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation (collectively, "OFAC Laws and Regulations"); or (ii) a Person (a "<u>Designated Person</u>") either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (B) designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or similarly designated under any related enabling legislation or any other similar Executive Orders (collectively, the "<u>Executive Orders</u>").  The OFAC Laws and Regulations and the Executive Orders are collectively referred to in this Agreement as the "<u>Anti-Terrorism Laws</u>".  Buyer also shall require, and shall take reasonable measures to ensure compliance with the requirement, that no Person who owns any other direct interest in Buyer is or shall be listed on any of the Lists or is or shall be a Designated Person. This paragraph shall not apply to any Person to the extent that such Person's interest in the Buyer is through a U.S. Publicly-Traded Entity.  As used in this paragraph, "U.S. Publicly-Traded Entity" means a Person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a Person.

12.3  **<u>Disclaimer of Warranties: "As Is" Conveyance</u>.  AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT: (I) DURING THE FEASIBILITY PERIOD, BUYER WILL CONDUCT ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF ALL ASPECTS OF THE PROPERTY, (II) OTHER THAN AS EXPRESSLY SET OUT HEREIN, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR STATEMENTS OF SELLER OR ITS AGENTS, AND (III) BUYER IS RELYING ON SUCH INDEPENDENT INVESTIGATION AND**

INSPECTION AND IS NOT RELYING ON ANY INFORMATION PROVIDED BY SELLER, SELLER'S ENGINEERS OR THE BROKERS IN DETERMINING WHETHER TO PURCHASE THE PROPERTY.

AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT: EXCEPT FOR SELLER'S EXPRESS WRITTEN REPRESENTATIONS, WARRANTIES AND COVENANTS EXPRESSLY SET OUT IN THIS AGREEMENT OR IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO: (A) THE NATURE, QUALITY, OR CONDITION OF THE PROPERTY; (B) THE INCOME TO BE DERIVED FROM THE PROPERTY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON IN THE FUTURE; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, INCLUDING, BUT NOT LIMITED TO, ANY STATE OR FEDERAL ENVIRONMENTAL LAW, RULE OR REGULATION; (E) THE HABITABILITY, MERCHANTABILITY, OR FITNESS OF THE PROPERTY FOR A PARTICULAR PURPOSE; OR (F) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY (COLLECTIVELY THE "DISCLAIMED MATTERS"). BUYER HEREBY WAIVES ANY SUCH OTHER EXTRA-CONTRACTUAL REPRESENTATION, WARRANTY, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES.

AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT EXCEPT AS EXPRESSLY SET OUT IN THIS AGREEMENT OR IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, SELLER IS CONVEYING THE PROPERTY TO BUYER "AS IS" "WHERE IS," AND WITH ALL FAULTS AND EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS, OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE SELLER.

WITHOUT IN ANY WAY LIMITING ANY PROVISION OF THIS SECTION 12.3, BUYER SPECIFICALLY ACKNOWLEDGES AND

**AGREES THAT, EXCEPT AS EXPRESSLY SET OUT IN THIS AGREEMENT OR IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST SELLER, AND SELLER'S PARTNERS, OFFICERS, AND AGENTS WITH RESPECT TO (i) THE DISCLAIMED MATTERS, (ii) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (iii) THE PAST, PRESENT OR FUTURE CONDITION OR COMPLIANCE OF THE PROPERTY WITH REGARD TO ANY ENVIRONMENTAL PROTECTION, POLLUTION CONTROL OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980 (HEREIN CALLED "<u>CERCLA</u>"), AND (iv) ANY OTHER STATE OF FACTS THAT EXISTS WITH RESPECT TO THE PROPERTY; _**PROVIDED, HOWEVER**_, THE FOREGOING WAIVER, RELEASE AND DISCHARGE DOES NOT WAIVE, RELEASE, OR DISCHARGE ANY CLAIM BUYER MAY HAVE AGAINST SELLER PURSUANT TO THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN (DURING THE PERIOD FOR WHICH SUCH EXPRESS REPRESENTATIONS AND WARRANTIES SURVIVE) OR IN THE DOCUMENTS TO BE DELIVERED AT CLOSING.**

**THE FOREGOING PROVISIONS SHALL BE CONTAINED IN THE DEED FROM SELLER TO BUYER AND SHALL SURVIVE THE CLOSING IN ALL RESPECTS.**

13. <u>Default</u>.

13.1 <u>Seller's Default</u>.  Except as set out herein for Surviving Obligations, if: (a) Seller fails to comply with any of the provisions of this Agreement, or (b) Seller is found, as reasonably determined by Buyer, to have materially misrepresented its ownership of the Scheduled Personal Property; then, in either event, Buyer may at its sole discretion, as its sole and exclusive remedy: (i) terminate this Agreement and receive back the Earnest Money (less the Independent Consideration which shall be paid to Seller), and Seller shall reimburse Buyer its Buyer's Expenses whereupon neither party hereto shall have any further duties, responsibilities, and obligations under this Agreement except for those duties, responsibilities, and obligations which expressly survive the termination hereof, or (ii) enforce specific performance of this Agreement.  Buyer must provide invoices and reasonable backup documentation in support of such Buyer's Expenses.  If Buyer fails to enforce specific performance of this Agreement in a timely manner under this section, Buyer shall be deemed irrevocably and conclusively to have elected to terminate this Agreement and to obtain a refund of the Earnest Money and payment of Buyer's Expenses under clause (i) above as its sole and exclusive remedy against Seller.  Except as set out herein relating to Surviving Obligations, Buyer specifically waives its rights to sue Seller for damages for Seller's failure to perform any of its obligations hereunder or relating hereto.

13.2 <u>Buyer's Default</u>.  Except as set out herein for Surviving Obligations, if Buyer fails to comply with any provision of this Agreement Seller may, as its sole and exclusive remedy, terminate this Agreement and receive the proceeds of the Earnest Money deposited during the term of this Agreement, as liquidated damages. Buyer and Seller agree that such sum shall be liquidated damages for a default by Buyer hereunder for those matters other than Surviving Obligations, and because of the difficulty, inconvenience and uncertainty of ascertaining actual damages for such default, Buyer and Seller agree such sums to be reasonable and appropriate damages for such default.

13.3 <u>Return of Earnest Money</u>.  If either party is entitled to any sums held in escrow by Escrow Agent under any provision of this Agreement, the other party agrees to deliver, upon written request of the party entitled to such amounts, any instructions that may be reasonably necessary to cause the Escrow Agent to deliver such amounts held by Escrow Agent to the party entitled thereto.

13.4 <u>Attorneys' Fees and Costs</u>.   In the event of any lawsuit between the parties pertaining to this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees, expenses, and other court costs.

13.5 <u>Bankruptcy Court Approval</u>. Buyer stipulates, acknowledges and agrees that this Agreement, and Seller's obligations hereunder, including closing the sale contemplated herein, are conditioned and contingent on approval by the Bankruptcy Court of this Agreement and the sale of the Property to Buyer.  In the event Seller is not the Successful Bidder, Buyer's sole and exclusive remedy is as provided in Section 6.3 herein.

13.6 <u>Notice of Default/Opportunity to Cure</u>.   Notwithstanding anything contained herein to the contrary, prior to enforcing a remedy available to a party hereunder, such party shall first provide the defaulting party with written notice of the defaulting party's default, such notice to contain reasonable specificity detailing the defaulting party's default, and the defaulting party shall have a period of three (3) business days after the defaulting party's receipt of such notice to cure such default; provided, however, if such default cannot be cured by the defaulting party within such period of time, the defaulting party shall have a reasonable period of time, not to exceed ten (10) days after the defaulting party's receipt of such notice, to cure such default.  After the time periods set forth above have lapsed, the party providing such notice to the defaulting party may enforce such party's remedies hereunder.  Notwithstanding anything herein to the contrary, no cure period shall apply to performance of any obligation of either party to be performed on the Closing.

14. <u>Notices</u>.  Any notices to be given hereunder shall be given by (i) placing the notice in the United States mail, certified with return receipt requested, properly stamped, (ii) delivered by fax or electronic mail (e-mail) transmission, (iii) delivered by overnight delivery service, or (iv) by personal delivery, in each case addressed to the location shown below or such other addresses as the respective party may direct in writing to the other, or to such

address.  Such notice shall be deemed effective (A) two (2) days after such placing in the mail when delivered by U.S. Mail service, (B) on the day actually delivered by an overnight delivery service, (C) upon confirmation of the completion of the fax (electronic or otherwise) when delivered by fax, or (D) upon such personal delivery:

Seller: _____

With copies to: Hoover Slovacek
Attn: Melissa Haselden
Galleria Tower II
5051 Westheimer, Suite 1200
Houston, Texas 77056
(713) 735-4196 Telephone
brown@hooverslovacek.com
haselden@hooverslovacek.com

Buyer: 14500 Cutten Rd., Ste. 2204
Houston, TX 77069
Attn:  Troy Worthington
troy@iconmetalsolutions.com
956-371-3118

With copies to: Nathan Sommers Jacobs
Attn: Kathryn Smyser
2800 Post Oak Boulevard, 61st Floor
Houston, Texas 77056
(713) 892-4813 Telephone
ksmyser@nathansommers.com

15. <u>Entire Agreement</u>.  This Agreement contains all agreements between the parties hereto and any agreement not contained herein shall not be recognized by the parties.  The captions used herein are for convenience only and shall not be used to construe this Agreement. Words of gender shall be construed to include any other gender, and words in the singular number shall include the plural and vice versa unless the context requires otherwise.

16. <u>Surviving Obligations</u>. Notwithstanding any other term or provision of this Agreement to the contrary, any obligation of a party to this Agreement which is a "Surviving Obligation", and any such other rights, duties or obligations that expressly survive the Closing or termination of this Agreement, shall survive the termination of this Agreement for any reason whatsoever or the Closing.

17. <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Texas and venue shall lie in Harris County, Texas.

18. <u>Confidentiality</u>.  Buyer acknowledges the information and material Buyer may obtain in its review of the Property is confidential, and Buyer agrees to protect the confidentiality of the information relating to such information and relating to the transaction contemplated

herein.  Seller hereby agrees that notwithstanding the foregoing confidentiality agreement, Buyer may disclose information to its attorneys, employees, its agents, its proposed lenders or its proposed investors, to the extent reasonably necessary for such employees, agents, lenders or investors to properly analyze and evaluate the proposed transaction, loan or investment and for such employees and agents to advise Buyer, provided that such parties are bound to the terms of this confidentiality provision of this Agreement, or as required by applicable law or compelled by a governmental authority. Buyer's obligations under this Section shall be a Surviving Obligation under the terms of this Agreement.

19.  <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

20.  <u>Effective Date and Date Hereof</u>.  Any reference in this Agreement to "the date hereof", "Effective Date", the "effective date of this Agreement", "the date of this Agreement" or any similar referral shall refer to the date that a fully executed copy of this Agreement is deposited with the Title Company and acknowledged by the Title Company as received.

21.  <u>Offer and Acceptance</u>.  Buyer acknowledges and agrees that the submission of this Agreement to Buyer shall not and does not constitute an offer to sell the Property.  Buyer and Seller agree that there can be no agreement for the purchase and sale of the Property until all parties hereto have signed, delivered, and accepted this Agreement.

22.  <u>Time of Essence</u>.  Time is of the essence in the performance of the terms of this Agreement.

23.  <u>Assignability</u>.  Buyer shall have the right to assign this Agreement or any of its rights hereunder to any entity (or entities) owned and controlled by Buyer, provided that the assignee (or assignees) shall assume all obligations of Buyer hereunder and provided further that written notice of such assignment is given to Seller at least five (5) business days prior to Closing.  From and after such assignment, wherever in this Agreement reference is made to Buyer such reference shall mean the assignee(s) who shall succeed to all the rights, duties and obligations of Buyer hereunder.  In the event that any assignment of this Agreement is made by Buyer, then Buyer will immediately provide written notice thereof to Seller. Any attempted assignment except as expressly permitted hereby shall be null and void and of no force or effect.

24.  <u>Counterparts and Faxed Signatures</u>.  This Agreement may be executed in one (1) or more counterparts, each of which when taken together shall constitute but one and the same Agreement. Counterparts bearing facsimile signatures shall be deemed to constitute originals.

25.  <u>Saturday, Sundays and Holidays</u>.  If the time period for any action to be taken pursuant to this Agreement falls on a Saturday, Sunday or Public Holiday the time period for taking such action shall be extended automatically until the next following business day that is not a Saturday, Sunday or Public Holiday. For the purpose of this Section, a Public Holiday shall be one of the public holidays specified in 5 U.S.C. §6103(a), as may be amended from time to time.

26.   <u>Disclosures</u>.

    26.1   <u>Title</u>.  Buyer should have an Abstract covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy.

    26.2   <u>Consult your Attorney</u>.  This is intended to be a legally binding contract, READ IT CAREFULLY, if you do not understand the effect of any part of this Agreement contact your attorney before signing.  No representation is made as to the tax consequences of any provision herein in any specific transaction.

27.   <u>1031 Exchange</u>.  Seller and Buyer each agree to cooperate with the other party to facilitate Seller's transfer of the Property and/or Buyer's purchase of the Property as part of a tax-deferred exchange under Section 1031, Internal Revenue Code ("<u>1031 Exchange</u>"), provided that in so cooperating neither party is obligated to incur any additional liability or expense or to agree to any extension of any time limit provided in this Agreement. Any provision of this Agreement to the contrary notwithstanding, either Seller or Buyer may assign its respective interest in this Agreement to a qualified intermediary, trustee, or other similar person (collectively, an "<u>Intermediary</u>") as reasonably required to facilitate such exchange. Seller and Buyer each agree that no Intermediary shall have any liability or obligation pursuant to this Agreement notwithstanding the assignment to such Intermediary of any interest herein, and Seller and Buyer each agree to look exclusively to the other party for performance of the other party's duties and obligations under this Agreement.

28.   <u>Executory Contracts</u>.

    28.1   Within three (3) days from the Effective Date, Seller shall provide Buyer with a list of, and the current costs on that date and the estimated costs on the Closing Date, to cure all monetary defaults related to each of its Contracts and Licenses and Permits ("<u>Cure Costs</u>").

    28.2   Seller shall assume and assign to Buyer at the Closing the Assumed Contracts and each shall be deemed Property purchased by Buyer.  Upon entry of the Bankruptcy Court's Order approving the sale of the Property from Seller to Buyer in form described in Section 36 below (the "<u>Sale Order</u>"), all Assumed Contracts shall be deemed Property.

    28.3   Seller has sought approval by the Bankruptcy Court of the sale of the Property to Buyer, including the assumption and assignment by Seller to Buyer of the Assumed Contracts, in the form of a motion (the "<u>Sale Motion</u>").  Seller shall serve the Sale Motion on all counterparties to all such leases, contracts, and agreements, along with a notice specifically stating that Seller is or may be seeking the sale, assumption and assignment of such leases, contracts, and agreements, and shall notify such parties of the deadline for objecting to the Cure Costs for same, which deadline shall be not less than five (5) days after to the Bankruptcy Court hearing to consider the Sale Motion (the "<u>Sale Hearing</u>").  As part of the Sale Hearing, Seller shall file with the Bankruptcy Court a list identifying the Seller's  Contracts,

Licenses and Permits and the amounts, if any, necessary to cure monetary defaults under each of such lease, contract, and agreement so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as soon as possible.

29. <u>Assumed Liabilities</u>.   BUYER IS NOT EXPRESSLY OR BY IMPLICATION ASSUMING OR AGREEING TO ASSUME OR DISCHARGE ANY LIABILITY OR OBLIGATION OF THE SELLER WHATSOEVER, WHETHER NOW EXISTING OR HEREAFTER INCURRED, INCLUDING ANY LIABILITY OR OBLIGATION RELATING TO THE PROPERTY, THE SELLER'S BUSINESS OR THE SALE OF ANYTHING RELATED TO IT, other than the following express liabilities (the "<u>Assumed Liabilities</u>"), for which Assumed Liabilities Buyer agrees to be solely responsible:

> 29.1.1  all liabilities relating to the ownership or operation of the Property accruing after the Closing Date;

> 29.1.2  Seller's liability under any Assumed Contracts, assumed by and assigned to Buyer, if any, which liability arises after the Closing Date; and

> 29.1.3  all ad valorem property taxes directly attributable to the Property which are levied by the Texas counties in which the Property is located, for the calendar year beginning January 1, 2019, prorated from the Closing Date to end of year 2019 (the "<u>2019 Property Taxes</u>").

30. <u>Excluded Liabilities</u>. Seller shall promptly pay, discharge and perform in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, and shall remain solely and exclusively liable for any liabilities which are not Assumed Liabilities (the "<u>Excluded Liabilities</u>"), including, without limitation:

> 30.1.1  payments made to or fees and expenses accrued with respect to professionals retained or employed by Seller;

> 30.1.2  any pre- or post-bankruptcy, priority, tax, or other claims against the Seller, including, *inter alia*, any claims or obligations related to or arising liabilities for funding any pension plan (whether a defined benefit plan or otherwise); and

> 30.1.3  all Chapter 11 expenses.

31. <u>Pre-Closing Access</u>.  From the Effective Date through the Closing, upon reasonable prior written notice to Seller and in the presence of a representative of Seller if required by Seller, Buyer shall be authorized and entitled, through its financial advisors, legal counsel, accountants, consultants, financing sources and other representatives, (a) to make such investigation of the Property and business and operations of the Seller, and such examination of Seller's books and records, the Property and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records, (b) to contact and to enter into discussions and negotiate with Seller's vendors, suppliers, customers, strategic business partners and other third parties, including governmental authorities, regarding the proposed sale to Buyer and Buyer's potential business

relationships with such persons following the Closing, and (c) to be afforded reasonable access during ordinary business hours to Seller's employees, consultants and independent contractors.   Seller shall furnish to Buyer and its representatives, as promptly as practicable, all other information (other than any information covered by attorney-client or work product privilege not included within the Property) as Buyer or any of such persons may reasonably request in furtherance of the proposed sale to Buyer.  From the Effective Date through the Closing, Seller shall promptly deliver or make available to Buyer and its representatives all notices, statements, schedules, applications, reports and other papers anywhere related to the Debtor's business or the Property.

32.   <u>Cooperation</u>.

      32.1.1   Buyer and Seller agree to execute and deliver all other instruments and take all such other actions that either party may reasonably request from time to time, before or after Closing and without payment of further consideration, to effectuate this Agreement and to confer to the parties the benefits intended by such transactions. The parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement and any of the Closing documents.

      32.1.2   Seller agrees that, following the Closing, it shall provide Buyer and its representatives with such reasonable access to the records, financials and corporate documents retained by Seller as Buyer may reasonably request and to make copies of the same, at Buyer's expense, in connection with (i) the preparation of tax returns or information returns, (ii) reports or other obligations by Buyer to governmental agencies, and (iii) such other matters as Buyer may require.

33.   <u>Employment of Employees</u>.  Buyer may employ, in its sole discretion, any of the current or former employees of Seller. Seller agrees to take no action outside of the ordinary course of business that could reasonably be expected to interfere with such employment by Buyer, and shall take all action required by law or otherwise reasonably requested by Buyer to cause the valid termination of employment at the Closing Date of such employees by Seller who are to be employed by Buyer following the Closing Date.  Nothing in this Agreement is intended to confer upon any employee or former employee of Seller any rights or remedies, including, without limitation, any rights of employment of any nature or kind whatsoever.

34.   <u>Name Change</u>. Seller shall take all corporate and other actions reasonably requested by Buyer to change its corporate name at the Closing Date so that Buyer will have the right to use such name.

35.   <u>Consummation of Transaction</u>. The parties shall each use reasonable efforts to cause the transactions provided for in this Agreement to be consummated once it is approved by the Bankruptcy Court, and, without limiting the generality of the foregoing, shall use reasonable efforts to obtain all necessary approvals, waivers, consents, permits, licenses,

registrations and other authorizations required in connection with the Closing documents, including, but not limited to, the Sale Order.

36. <u>Sale Motion</u>.  The Sale Motion shall be authorized by the Sale Order, which shall be in a form satisfactory to Buyer in its reasonable discretion no later than May 31, 2019, that finds and determines, among other things, that:

    36.1 Debtor is authorized to consummate the transactions provided for in this Agreement;

    36.2 Buyer is a "good faith purchaser" of the Property including as assignee of the Assumed Contracts, if any, which are not Excluded Assets;

    36.3 the Property, including the Assumed Contracts of Seller, will be transferred and assigned free and clear of all transfer restrictions, liens, claims, security interests and other encumbrances of every kind or nature whatsoever, whether arising by agreement, operation of law or otherwise;

    36.4 the purchase price for the Property shall be the Purchase Price, as adjusted hereunder to the extent provided herein; and

    36.5 Buyer shall not be deemed a successor and shall acquire no successor liability of any kind whatsoever for any obligation of the Seller, or any claims against the Seller or the Property, as a result of the sale of the Property (including assignment of the Assumed Contracts) to Buyer.

37. <u>Defense of Orders</u>.  Seller shall seek emergency entry of the Sale Order.  Seller shall oppose any application for an order reversing, modifying, staying, enjoining, or restraining the terms or effectiveness of the Sale Order.  Seller shall use its best efforts to defend the Sale Order in the event that Buyer elects, in its sole discretion, to close the purchase and assignment described above notwithstanding the pendency of any motion for reconsideration or appeal of the Sale Order.

38. <u>Real Estate Commissions</u>.  Neither Seller nor Buyer has contacted any real estate broker, finder or similar person in connection with the transaction contemplated hereby.  **TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, SELLER AND BUYER EACH HEREBY COVENANTS AND AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OTHER FROM AND AGAINST ANY AND ALL CLAIMS FOR REAL ESTATE COMMISSIONS, FEES OR SIMILAR CHARGES WITH RESPECT TO THIS TRANSACTION, ARISING BY, THROUGH OR UNDER THE INDEMNIFYING PARTY AND EACH FURTHER AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OTHER FROM ANY LOSS OR DAMAGE RESULTING FROM AN INACCURACY IN THE REPRESENTATIONS CONTAINED IN THIS SECTION.**  The following disclosure is provided in accordance with applicable law:  Buyer is advised that it should either have the abstract covering the Property examined by an attorney of Buyer's own selection or be furnished with or obtain a policy of title insurance.

39.    <u>Conditions Precedent To Buyer's Obligations</u>.    The obligations of Buyer under this Agreement are subject to satisfaction or fulfillment of the following conditions at or prior to the Closing Date, any one or more of which may be expressly waived in writing by Buyer in its sole discretion.  In the event such conditions, or any other conditions to Closing set forth in this Agreement, are not satisfied or waived at or prior to Closing, Seller shall be considered in default and Buyer shall have the rights and remedies set forth in Section 13.1 of this Agreement (provided, however, that if Buyer is not selected as the Successful Bidder Buyer's sole remedy shall be as provided in Section 6.3 herein, in lieu of all other remedies).

39.1    <u>Representations and Warranties</u>.    Each of the representations and warranties of Seller set forth in this Agreement shall be true, complete and correct in all material respects on the Effective Date through the Closing Date.

39.2    <u>Performance of Covenants</u>.  Each of the agreements, covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to Closing shall have been duly performed and complied with in all material respects.  Seller shall have delivered each of the documents and other deliverables required to be delivered by Seller pursuant to this Agreement.

39.3    <u>Bankruptcy Court Orders</u>.  The Bankruptcy Court shall have entered a final and non-appealable Sale Order in a form which is satisfactory to Buyer in its reasonable discretion and the Sale Order shall not have been stayed.

39.4    <u>Legal Matters</u>.  The Closing shall not, directly or indirectly (with or without notice or lapse of time or both), violate, contravene, materially conflict with or result in a violation of any law and shall not violate any order or decree of any court or governmental authority of competent jurisdiction, and no legal or administrative proceeding shall have been brought or threatened by any person which questions the validity of legality of this Agreement or any related contemplated transaction.

39.5    <u>Deliveries of Seller</u>. Seller shall have made the deliveries required by Section 7.

39.6    <u>Bankruptcy Matters</u>.   All authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of this Agreement and the transactions contemplated by it shall have been obtained, including but not limited to the entry of the Sale Order by the Bankruptcy Court, and Seller shall have received from the Bankruptcy Court any and all other orders, approvals and consents required to transfer the Property and to consummate the transactions provided for in this Agreement.

[Signatures Appear on Following Page]

EXECUTED by Seller this _____ day of _____, 2019.

**SELLER**:

**ARSHAM METAL INDUSTRIES, INC.**,
a Texas corporation

By: _____
      Name:
      Title:

**BUYER**:

**ICON METAL SOLUTIONS, LLC**,
a Texas limited liability company

By: _____
      Name:
      Title:

RECEIPT OF AGREEMENT

Receipt of the foregoing Agreement is hereby acknowledged on the ___ day of
_____, 2019. The foregoing date shall be the Effective Date as referred to in the
Agreement.

**THE ACCURATE GROUP OF TEXAS, LLC**


By:_____
　　　　Name:
　　　　Title:

RECEIPT OF EARNEST MONEY

Receipt of the Earnest Money is hereby acknowledged on the ___ day of _____, 2019.  The undersigned shall hold the Earnest Money in accordance with the terms of this Agreement.

**THE ACCURATE GROUP OF TEXAS, LLC**


By:_____
          Name:
          Title:


<u>EXHIBITS</u>:

Exhibit "A" - Legal Description
Exhibit "B" – Special Warranty Deed
Exhibit "C" – Assignment and Assumption
Exhibit "D" – Bill of Sale

EXHIBIT "A"

## LEGAL DESCRIPTION

LOT 36-B, OF FAIRVIEW GARDEN, LOT 36B PARTIAL REPLAT, A SUBDIVISION IN HARRIS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN FILM CODE NO. 458013 OF THE MAP RECORDS OF HARRIS COUNTY, TEXAS.

EXHIBIT "B"

AFTER RECORDING RETURN TO:

_____

_____

_____

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## SPECIAL WARRANTY DEED

STATE OF TEXAS          §
                        §          KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF HARRIS        §

THAT **ARSHAM METAL INDUSTRIES, INC.**, a Texas corporation ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to it paid by _____, a _____ ("Grantee"), the receipt and sufficiency of which are hereby acknowledged and confessed by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does hereby GRANT, BARGAIN, SELL and CONVEY unto Grantee the tract of land lying and being situated in Houston, Harris County, Texas, as more particularly described on Exhibit "A" attached hereto and incorporated herein for all purposes (the "Land"), together with (a) all buildings, structures, fixtures and improvements situated on, in or under the Land (the "Improvements"), and (b) all of Grantor's right, title and interest in and to the appurtenances pertaining to the Land (hereinafter collectively referred to as the "Appurtenant Property"), including, but not limited to, all right, title and interest of Seller in and to adjacent roads, rights-of-way, alleys, drainage facilities, easements and utility facilities and strips and gores between the described Land and abutting properties, if any. The Land, Improvements, and Appurtenant Property are sometimes hereinafter referred to as the "Property".

This conveyance is made and accepted free and clear of all liens, claims, encumbrances, and interests pursuant to that certain "Sale Order" dated _____, 2019 and entered as Docket No. _____ in Case No. 19-31268-H2-11 in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division, and is subject to the exceptions set forth on Exhibit "B", attached hereto and made a part hereof for all purposes (the "Permitted Exceptions").

TO HAVE AND TO HOLD THE PROPERTY, together with all and singular the rights and appurtenances belonging in any way to the Property, subject to the provisions stated herein, to Grantee, Grantee's successors and assigns forever, and Grantor binds itself and its legal

representatives and successors TO WARRANT AND FOREVER DEFEND all and singular the Property to Grantee and Grantee's successors and assigns against every person lawfully claiming or to claim all or any part of the Property by, through, or under Grantor, but not otherwise.

**AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT: (i) GRANTEE HAS CONDUCTED ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF ALL ASPECTS OF THE PROPERTY, (ii) OTHER THAN AS EXPRESSLY SET OUT HEREIN OR IN THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED _____ ____, 2019, BY AND BETWEEN GRANTOR AND GRANTEE ("<u>PURCHASE AGREEMENT</u>"), GRANTEE IS NOT RELYING ON ANY REPRESENTATIONS OR STATEMENTS OF GRANTOR OR ITS AGENTS, (iii) GRANTEE IS RELYING ON SUCH INDEPENDENT INVESTIGATION AND INSPECTION AND IS NOT RELYING ON ANY INFORMATION PROVIDED BY GRANTOR, GRANTOR'S ENGINEERS OR THE BROKERS IN DETERMINING WHETHER TO PURCHASE THE PROPERTY, (iv) CERTAIN INFORMATION PROVIDED BY GRANTOR TO GRANTEE WITH RESPECT TO THE PROPERTY HAS BEEN OBTAINED FROM A VARIETY OF SOURCES AND THAT GRANTOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION, (v) GRANTEE IS FULLY AND COMPLETELY SATISFIED THAT THE PROPERTY IS SATISFACTORY IN ALL RESPECTS FOR GRANTEE'S INTENDED USE AND (vi) GRANTEE HAS NO RECOURSE WHATSOEVER AGAINST GRANTOR OR THE BROKER IN CONNECTION WITH THE PROPERTY OTHER THAN FOR ANY VIOLATIONS AS TO THE WARRANTIES AND COVENANTS OF GRANTOR CONTAINED HEREIN OR IN THE PURCHASE AGREEMENT.**

**AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT: (i) EXCEPT FOR THE SPECIAL WARRANTY SET OUT HEREIN OR THE EXPRESS REPRESENTATIONS SET OUT IN THE PURCHASE AGREEMENT, GRANTOR HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY, INCLUDING BUT NOT LIMITED TO: (A) THE NATURE, QUALITY, OR CONDITION OF THE PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH GRANTEE MAY CONDUCT THEREON IN THE FUTURE; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, INCLUDING, BUT NOT LIMITED TO, ANY STATE OR FEDERAL ENVIRONMENTAL LAW, RULE OR REGULATION; (E)THE HABITABILITY, MERCHANTABILITY, OR FITNESS OF THE PROPERTY FOR A PARTICULAR PURPOSE; OR (F) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY (COLLECTIVELY, THE "<u>DISCLAIMED MATTERS</u>"). GRANTEE HEREBY WAIVES ANY SUCH OTHER REPRESENTATION, WARRANTY, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES.**

**AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT EXCEPT FOR THE SPECIAL WARRANTY CONTAINED HEREIN OR AS EXPRESSLY SET OUT IN THE PURCHASE AGREEMENT, GRANTOR IS CONVEYING THE PROPERTY TO GRANTEE "AS IS", "WHERE IS", AND WITH ALL FAULTS AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS, OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE GRANTOR.**

**WITHOUT IN ANY WAY LIMITING ANY PROVISION OF THE FOREGOING, GRANTEE SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST GRANTOR AND GRANTOR'S PARTNERS, OFFICERS AND AGENTS WITH RESPECT TO (i) THE DISCLAIMED MATTERS, (ii) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (iii) THE PAST, PRESENT OR FUTURE CONDITION OR COMPLIANCE OF THE PROPERTY WITH REGARD TO ANY ENVIRONMENTAL PROTECTION, POLLUTION CONTROL OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980 (HEREIN CALLED "CERCLA"), AND (iv) ANY OTHER STATE OF FACTS THAT EXISTS WITH RESPECT TO THE PROPERTY; PROVIDED, HOWEVER, THE FOREGOING WAIVER, RELEASE AND DISCHARGE DOES NOT WAIVE, RELEASE, OR DISCHARGE ANY CLAIM GRANTEE MAY HAVE AGAINST GRANTOR UNDER THE SPECIAL WARRANTY SET FORTH IN THIS DEED OR FOR BREACH OF THE EXPRESS REPRESENTATIONS (DURING THE PERIOD FOR WHICH SUCH EXPRESS REPRESENTATIONS SURVIVE) SET FORTH IN THE PURCHASE AGREEMENT.**

Current ad valorem taxes, assessments and fees relating to or pertaining to the Property, having been prorated to the date hereof, the payment thereof is hereby assumed by Grantee.

The mailing address of Grantee is set forth below:

_____

_____

[Signatures Appear on Following Page]

IN WITNESS WHEREOF, Grantor has caused this Deed to be executed on this _____ day of _____, 20__.

**GRANTOR:**

**ARSHAM METAL INDUSTRIES, INC.,**
a Texas corporation

By: _____
      [Name, Title]

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

The foregoing was acknowledged before me on the _____ day of _____, 20__, by [NAME, TITLE] of **ARSHAM METAL INDUSTRIES, INC.**, in such capacity.

_____
Notary Public, State of Texas

EXHIBIT "A"

**LEGAL DESCRIPTION**

LOT 36-B, OF FAIRVIEW GARDEN, LOT 36B PARTIAL REPLAT, A SUBDIVISION IN HARRIS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN FILM CODE NO. 458013 OF THE MAP RECORDS OF HARRIS COUNTY, TEXAS.

EXHIBIT "C"

## ASSIGNMENT AND ASSUMPTION

WHEREAS, concurrently with the execution and delivery hereof, **ARSHAM METAL INDUSTRIES, INC.**, a Texas corporation ("Assignor"), is conveying to _____, a _____ ("Assignee"), by Special Warranty Deed, that certain tract of land situated in Harris County, Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof by reference (the "Land"), together with (a) all buildings, structures, fixtures and improvements situated on, in or under the Land (the "Improvements"), and (b) all of Grantor's right, title and interest in and to the appurtenances pertaining to the Land (collectively, the "Appurtenant Property"), including, but not limited to, all right, title and interest of Seller in and to adjacent roads, rights-of-way, alleys, drainage facilities, easements and utility facilities and strips and gores between the described Land and abutting properties, if any.  The Land, Improvements, and Appurtenant Property are sometimes hereinafter referred to as the "Real Property".

WHEREAS, concurrently with the execution and delivery hereof,  Assignor is conveying to Assignee, by Bill of Sale,  the personal property owned by Assignor, including, without limitation, all inventory, furniture, furnishings, fixtures, fittings, appliances, apparatus, equipment, tools, machinery, maintenance supplies, heating, ventilating, air-conditioning, incinerating, lighting, plumbing and electrical fixtures, hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment, contract rights, claims, systems, names, "doing business as" names, goodwill, trademarks, websites, domain names, e-commerce names, social media accounts, email addresses, telephone numbers, facsimile numbers, logos, customer information, vendor information, books, records, files and other items of tangible and intangible personal property (collectively, the "Personal Property").  The Real Property and the Personal Property are sometimes referred to as the "Property".

WHEREAS, in connection with the sale of the Property, Assignor desires to assign to Assignee, and Assignee desires to obtain by assignment from Assignor and to assume all obligations of Assignor thereunder, all of the Assigned Contracts (as defined below).

NOW, THEREFORE, in consideration of the premises and the conditions set forth below, and the payment of TEN and NO/100 DOLLARS ($10.00), the receipt and sufficiency of which is hereby expressly acknowledged, Assignor has ASSIGNED, and by these presents does hereby ASSIGN unto Assignee, and Assignee accepts from Assignor, all of Assignor's right, title, and interest in and to the following, as more particularly described on Exhibit "B" attached hereto and made a part hereof by reference (the "Assigned Contracts"), in each case, to the extent transferable, to wit:

1. any and all rights to sanitary sewer wastewater capacity, water and storm drainage, and other utilities serving the Land and the Improvements;

2. any and all transferable or assignable permits and licenses owned by Assignor and in any way related to the Property;

3. any and all transferable or assignable dealer, manufacturer, builder, or other warranties pertaining in any way to the Improvements or any Personal Property, except for any of Assignor's personal items, if any; and

4. any other Assigned Contracts set forth on <u>Exhibit "B"</u> attached hereto.

TO HAVE AND TO HOLD the Assigned Contracts unto Assignee and Assignee's successors and assigns forever; and Assignor does hereby bind Assignor and its successors and assigns to WARRANT AND FOREVER DEFEND, all and singular the title in and to said Assigned Contracts unto the said Assignee and Assignee's successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor, but not otherwise.

As a material part of the consideration for this Assignment and Assumption, Assignee acknowledges and agrees that Assignor is conveying the Assigned Contracts described above to Grantee "AS IS", "WHERE IS" and with all faults and specifically and expressly without any warranties, representations, or guarantees, either express or implied, of any kind, nature or type whatsoever from or on behalf of the Assignor, except as expressly set forth herein or in the Agreement.

Assignee expressly accepts and assumes all right, title, interest, obligation, and liability in, to or under the Assigned Contracts arising or accruing from and after the date hereof, and Assignor shall have no further covenant, duty, obligation, or responsibility under the Assigned Contracts arising or accruing on and after the date hereof.

**ASSIGNOR, TO THE FULLEST EXTENT PERMITTED BY LAW, SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS ASSIGNEE, AND ANY OF ITS PAST, PRESENT, OR FUTURE PARTNERS, MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS, REPRESENTATIVES, SUCCESSORS, AND ASSIGNS, OR ANY SUBSIDIARY, AFFILIATE, OR PARENT THEREOF, FROM AND AGAINST ANY AND ALL THIRD PARTY CLAIMS, DEMANDS, CAUSES OF ACTION, CHARGES, JUDGMENTS, DAMAGES, LIABILITIES, COSTS, OR EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COURT COSTS) ARISING OUT OF, RESULTING FROM, RELATING TO, OR IN CONNECTION WITH THE ASSIGNED CONTRACTS IN CONNECTION WITH EVENTS ARISING, ACCRUING, OR OCCURRING PRIOR TO THE DATE HEREOF. ASSIGNEE SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS ASSIGNOR, AND ANY OF ITS PAST, PRESENT, OR FUTURE PARTNERS, MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS, REPRESENTATIVES, SUCCESSORS, AND ASSIGNS, OR ANY SUBSIDIARY, AFFILIATE, OR PARENT THEREOF, FROM AND AGAINST ANY AND ALL THIRD PARTY CLAIMS, DEMANDS, CAUSES OF ACTION, CHARGES, JUDGMENTS, DAMAGES, LIABILITIES, COSTS, OR EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COURT COSTS) ARISING OUT OF, RESULTING FROM, RELATING TO, OR IN CONNECTION WITH THE ASSIGNED**

**CONTRACTS IN CONNECTION WITH EVENTS ARISING, ACCRUING, OR OCCURRING ON OR AFTER THE DATE HEREOF.**

This Assignment and Assumption and the provisions herein contained shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

This Assignment and Assumption may be executed in multiple counterparts which when taken together shall constitute an original.

*[Remainder of Page Intentionally Left Blank.  Signature Page to Follow.]*

IN WITNESS WHEREOF, the parties have executed this instrument this _____ day of _____, 2019.

**ASSIGNOR**:

**ARSHAM METAL INDUSTRIES, INC.,**
a Texas corporation

By: _____
       Name:
       Title:

**ASSIGNEE**:

_____,
a _____

By: _____
       Name:
       Title:

EXHIBIT "A"

**LEGAL DESCRIPTION**

EXHIBIT "D"

**BILL OF SALE**

**ARSHAM METAL INDUSTRIES, INC.**, a Texas corporation ("Grantor"), has heretofore entered into a Purchase and Sale Agreement, dated effective _____, 2019 (the "Agreement"), with _____, a _____ ("Grantee"), for the sale of certain real and personal property of Grantor to Grantee.

WHEREAS, it is the desire of Grantor to assign, transfer and convey to Grantee, pursuant to the Agreement, all personal property set forth on Exhibit "A" attached hereto of, together with all of Grantor's right, title and interest in any other personal property owned by Grantor, including, without limitation, all inventory, furniture, furnishings, fixtures, fittings, appliances, apparatus, equipment, tools, machinery, maintenance supplies, heating, ventilating, air-conditioning, incinerating, lighting, plumbing and electrical fixtures, hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment, contract rights, claims, systems, names, "doing business as" names, goodwill, trademarks, websites, domain names, e-commerce names, social media accounts, email addresses, telephone numbers, facsimile numbers, logos, customer information, vendor information, books, records, files and other items of tangible and intangible personal property (collectively hereinafter referred to as the "Personal Property"), but expressly excluding the personal property set forth on Exhibit "B" attached hereto.

NOW THEREFORE, in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00), in hand paid by Grantee to Grantor and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Agreement, Grantor does hereby TRANSFER, ASSIGN AND DELIVER, to Grantee the Personal Property, excepting and excluding the Excluded Personal Property, free and clear of all liens, claims, encumbrances and interest, pursuant to that certain "Sale Order" dated _____, 2019 and entered as Docket No. _____ in Case No. 19-31268-H3-11 in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division.

TO HAVE AND TO HOLD the Personal Property unto Grantee, its successors and assigns, forever, and Grantor does hereby bind itself, its successors and assigns, to WARRANT and FOREVER DEFEND, all and singular, title to the personal property described on Exhibit "A" unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through, or under Grantor, but not otherwise.

As a material part of the consideration for this Bill of Sale, Grantee acknowledges and agrees that Grantor is conveying the Personal Property described above to Grantee "AS IS", "WHERE IS" and with all faults and specifically and expressly without any warranties, representations, or guarantees, either express or implied, of any kind, nature or type whatsoever from or on behalf of the Grantor, except as expressly set forth herein or in the Agreement.

[Signature Page follows]

EXECUTED effective this _____ day of _____, 20__.

**GRANTOR:**

**ARSHAM METAL INDUSTRIES, INC.,**
a Texas corporation

By: _____
      Name, Title

<u>SCHEDULE 1.2(a)</u>

**EXCLUDED PERSONAL PROPERTY**

All cash, accounts receivable, and bank accounts of Seller.

<u>SCHEDULE 1.2(b)</u>

**PERSONAL PROPERTY**

1   **2014 Cat M322D Material Handler with Grapple**
2   **2018 Ford Truck**
3   **Automobile (2 Work Trucks)**
4   **2008 Colmar Baler W/ Crane B5000**
5   **1980 Streeter Amet Truck Scale**
6   **DPS Software**
7   **Fixed Assets – Seller to identify**
8   **Mansel Furnace**
9   **Office Equipment, Supplies, Safety Supplies, Safety Equipment, Maintenance Tools, & Furniture**
10  **Micropulse Baghouse**
11  **2012 Al-Jon Baler with Material Handler**
12  **Complete Furnace System - 55,000 LB Cap 375 CU. FT Furnace Control Room "De-Ox" Conveyance System Dross Tumbler Wheelabrator Pulse Jet Bag House also including auxiliary equipment including but not limited to Lime Feed System and electrical components**
13  **Sennebogan Crane 821M**
14  **Complete Spectrograph (Manufacturer Spectro)**
16  **Rolloff Boxes (Approximately Qty: 2) and Hoppers (Approximately Qty 30)**
17  **Volvo Front End Loader**
18  **Software Licenses and Hardware including Username and Passwords (PLC Controls, Scrap Management and Accounting Software)**
19
    **Any and All Processing Tools Onsite per Inspection**
20  **Various Brand Platform Scales - Quantity 3**
21  **Harris Downstroke Baler**
22  **Niton XL2 980 Gold Alloy Analyzer**
23  **Pyrtotek 1 Ton Molds with Conveyor System**
24  **Toyota Forklifts - Qty Six - All 2016**
25  **Caterpilar Forklift PD8000D w/ Cascade**

SCHEDULE 7.4

**ASSUMED CONTRACTS**