

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
05/10/2019

| | | |
|---|---|---|
| **IN RE** | § | **Chapter 11** |
| | § | |
| **ARSHAM METAL INDUSTRIES, INC.** | § | **Case No. 19-31268** |
| | § | |
| **Debtor** | § | |
| | § | |

**ORDER (A) AUTHORIZING AND APPROVING SALE OF ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS;
(B) APPROVING THE PURCHASE AND SALE AGREEMENT; (C) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
<u>UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF</u>**
(Relates to Docket No. 54)

Arsham Metal Industries, Inc., debtor and debtor-in-possession ("**Arsham**") filed its motion (the "**Motion**") for entry of an order (the "**Order**") approving the sale (the "**Sale**") of substantially all of Arsham's assets (the "**Assets**") free and clear of all liens, claims, encumbrances and other interests.  This Order approves the Sale of the Assets, as specified herein, to 11280 Charles Road, L.P. (the "**Buyer**") pursuant to the Purchase and Sale Agreement (the "**PSA**") attached as **Exhibit 1**.

The *Order (A) Approving Stalking Horse Bidder and Break-Up Fee; (B) Approving Bidding Procedures; (C) Setting an Auction; (D) Approving the Form and Manner of the Notice of (I) Auction and Sale Hearing, and (II) Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases and Proposed Cure Costs Relating Thereto; and (E) Setting Sale Hearing* [Docket No. 69] was entered on April 17, 2019 (the "**Bid Procedures Order**") and stated that an auction for the Assets would be conducted in the event that Arsham received a Qualified Bid prior to the Bid Deadline.  On May 6, 2019, Arsham conducted an auction (the "**Auction**") after which it identified and chose the best and highest bid for Arsham's Assets in accordance with the Bid Procedures Order.

The Court finds that the relief requested in the Motion is in the best interest of Arsham's estate and all other parties in interest and, having reviewed the Motion and having heard the statements and evidence in support of the relief requested therein at a hearing before the Court on April 17, 2019, where the Court considered and approved entry of the Bid Procedures Order (the "**Bid Procedures Hearing**") and the hearing before the Court on May 6, 2019, where the Court considered entry of this Order (the "**Sale Hearing**"), the Court further finds that the legal and

factual bases set forth in the Motion, at the Bid Procedures Hearing, and at the Sale Hearing establish just cause for the relief granted herein.

Pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014, the Court makes the following **FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

### JURISDICTION AND VENUE

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue in this district is allowed under 28 U.S.C. § 1408.  The Motion and Sale Hearing are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N), and (O) as well as Sections 105 and 363 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.  The consummation of the Sale contemplated by the PSA and this Order is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules,[1] and Arsham, the Buyer and any of their affiliates have complied with all of the applicable requirements of such sections and rules in respect of the Sale.

### NOTICE

B.      As evidenced by the affidavits and/or certificates of service filed with the Court, proper, timely, adequate, and sufficient notice of, inter alia, the Motion, the Bid Procedures, the Auction, the Sale, the assumption and assignment to the Buyer of the any unexpired executory contracts and leases including the proposed cure costs with respect to any defaults under such agreements (the "**Cure Costs**"), the Sale Hearing, and all deadlines related thereto, have been provided, as relevant, in accordance with sections 102(1 ), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and in compliance with the Bid Procedures Order to all creditors, parties-in-interest, and other interested persons and entities

C.      Under the circumstances of this case and pursuant to Bankruptcy Rule 2002(a)(2), such notice was proper, timely, adequate and sufficient, and in accordance with the various provisions Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all requirements of procedural due process, and the notice provided by Arsham is all that was possible or reasonably practicable under the circumstances.  No other notice is or will be required.

### MARKETING AND SALE PROCESS

D.      The Sale of the Assets to the Buyer is duly authorized pursuant to sections 363(b)(1) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f).  As demonstrated by (i) testimony and other evidence proffered or adduced at the Bid Procedures Hearing and the Sale

---

[1] "Bankruptcy Code" means 11 U.S.C. § 101 *et seq*; "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedures; "Local Rules" means the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas.

Hearing and (ii) the representations of counsel made on the record at the Bid Procedures Hearing and the Sale Hearing, Arsham and its professionals, agents, and other representatives have marketed the Assets and conducted all aspects of the sale process in good faith and, where applicable, in compliance with the Bid Procedures and the Bid Procedures Order. The marketing process undertaken by Arsham and its professionals, agents and other representatives with respect to the Assets has been adequate and appropriate  and reasonably calculated to maximize value for the benefit of all stakeholders.  The Bid Procedures and the Auction were duly noticed, were substantively and procedurally fair to all parties, and were conducted in a diligent, non-collusive, fair and good-faith manner.  The offer memorialized by the PSA represents the highest and best offer for the Assets.

E.      The Bid Deadline passed at 4:00 p.m. (Central Time), on May 3, 2019.  Arsham conducted an Auction on May 6, 2019, in accordance with the Bid Procedures and Bid Procedures Order.  At the hearing, Arsham announced that Buyer was the Successful Bidder submitting the highest and best bid for the Assets in accordance with the Bid Procedures Order. As established by the record of the Bid Procedures Hearing and the Sale Hearing, the bidding and related procedures established by the Bid Procedures Order have been complied with in all material respects by Arsham.  The Bid Procedures afforded a full, fair and reasonable opportunity for Qualified Bidders to make a higher or otherwise better offer to purchase the Assets and no such offer was received by Arsham.

**CORPORATE AUTHORITY**

F.      The Assets identified in the PSA are property of Arsham's estate, and title thereto is vested in Arsham's estate within the meaning of section 541(a) of the Bankruptcy Code.  Arsham (i) has full corporate power and authority to execute the PSA and all other documents contemplated thereby, and the Sale to the Buyer has been duly and validly authorized by all necessary corporate action, (ii) has all of the corporate power and authority necessary to consummate the Sale contemplated by the PSA, (iii) has taken all corporate action necessary to authorize and approve the PSA and the consummation by Arsham of the Sale contemplated thereby, and (iv) require no consents or approvals, other than those expressly provided for in the PSA, to consummate the Sale.

**HIGHEST AND BEST BID; BUSINESS JUDGMENT**

G.      Arsham demonstrated a sufficient basis to enter into the PSA, sell the Assets on the terms outlined therein, and assume and assign the unexpired leases and executory contracts (the "**Assumed Contracts**") to the Buyer under sections 363 and 365 of the Bankruptcy Code.  All such actions are appropriate exercises of Arsham's business judgment and are in the best interests of Arsham, its creditors, its estate and other parties in interest.  Good, sufficient, and sound business justification exists, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, for the sale of the Assets, including the assumption, assignment and sale of the Assumed Contracts,

to Buyer.  Approval of the Sale pursuant to the PSA at this time is in the best interests of Arsham, its creditors, its estate, and all other parties in interest.

H.      The offers of the Buyer, upon the terms and conditions set forth in the PSA, including the total consideration to be realized by Arsham thereunder, (i) constitutes the highest and best offer received by Arsham as a result of its marketing process, including through the Bid Procedures and the Auction, (ii) is in the best interests of Arsham, its creditors, its estate, and all other parties in interest, and (iii) constitutes full and adequate consideration, is fair and reasonable and constitutes reasonably equivalent value, fair consideration, and fair value for the Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and under the laws of any state, territory, or possession of the United States.  Taking into consideration all relevant factors and circumstances, no other person or entity has offered to purchase the Assets for greater economic value to Arsham or its estate.

I.      There has been no showing that Arsham or Buyer (i) has entered into the PSA or proposes to consummate the Sale for the purposes of hindering, delaying, or defrauding Arsham's present or future creditors or (ii) is entering into the PSA or proposing to consummate the Sale fraudulently, for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or any other applicable jurisdiction with laws substantially similar to the foregoing.

J.      The sale of the Property is duly authorized pursuant to sections 363(b)(1) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f).  As demonstrated by (i) the testimony and other evidence adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, Arsham has marketed the Property and conducted all aspects of the sale process at arms' length, in good faith, and in compliance with applicable law.  The marketing process undertaken by Arsham and its professionals, agents, and other representatives with respect to the Property has been adequate, appropriate, and reasonably calculated to maximize value for the benefit of all stakeholders given the exigencies of this case.  The sale process was conducted in a diligent, non-collusive, fair, and good faith manner.  The PSA constitutes the highest or otherwise best remaining offer for the Property.

K.      The sale of the Assets outside a chapter 11 plan pursuant to the PSA neither impermissibly restructures the rights of Arsham's creditors or equity interest holders nor impermissibly dictates the terms of any chapter 11 plan that may be filed by Arsham.  The Sale of the Assets does not constitute a sub rosa chapter 11 plan.

### OPPORTUNITY TO OBJECT

L.      A reasonable opportunity to object or be heard with respect to the Motion, the Bid Procedures, the Auction, the Sale, the assumption and assignment to the Buyer of the Assumed

Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto has been afforded to all creditors, equity holders, parties-in-interest, and other interested persons and entities.

<u>GOOD FAITH PURCHASER</u>

M.     The PSA was negotiated, proposed, and entered into by Arsham and the Buyer without collusion, in good faith, and from arm's length bargaining positions. Neither Arsham or the Buyer has engaged in any conduct that would cause or permit the PSA or the Sale to be avoided or otherwise challenged under section 363(n) of the Bankruptcy Code.

N.     Buyer is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the PSA and the assumption and assignment of the Assumed Contracts to the Buyer or its affiliates), unless such authorization is duly stayed pending such appeal prior to the Closing (as defined in the PSA).

O.     Neither the Buyer nor any of its affiliates, members, officers, directors, shareholders or any of their respective successors or assigns is an "insider" or "affiliate" of Arsham, as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code, and the Buyer and its professionals, agents and other representatives have complied in all respects with the Bid Procedures Order and all other applicable orders of this Court with respect to the PSA.

<u>FREE AND CLEAR TRANSFER REQUIRED BY BUYER</u>

P.     If Arsham does not sell the Assets free and clear of all Liens, Claims, and Interests, such a sale would yield substantially lower value for Arsham's estate, with less certainty than the Sale. The Buyer would not have submitted a bid or entered into the PSA, and would not consummate the Sale, thus adversely affecting Arsham, its estate, and its creditors, if the Sale and the assumption and assignment of the Assumed Contracts to the Buyer were not free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could, be liable for any liabilities other than as agreed in the PSA.

Q.     As of the Closing, pursuant and subject to the terms of the PSA and this Order, the transfer of the Assets and the Sale will effect a legal, valid, enforceable, and effective transfer of the Assets and will vest the Buyer with all of Arsham's rights, title, and interests in the Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever except for the any liabilities specifically assumed pursuant to the PSA.

<u>SATISFACTION OF SECTION 363(F)</u>

R.     Arsham may sell the Assets free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, including any rights or claims based on any putative successor

or transferee liability, as set forth herein, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  All parties in interest, including, without limitation, any holders of Liens, Claims, and/or Interests, and any non-debtor counterparties to the Assumed Contracts, who did not object, or who withdrew their objection, to the Sale, the Motion, the assumption and assignment of the applicable Assumed Contract or the associated Cure Cost are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Liens, Claims, or Interests and non-debtor parties to Assumed Contracts that did not object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code or are adequately protected by having their Liens, Claims, or Interests, if any, attach to the portion of the Sale Proceeds (as defined below) received by Arsham ultimately attributable to the Assets against which they assert an interest, in the order of their priority, with the same validity, force and effect, if any, which they now have against such Assets, subject to any claims and defenses Arsham or its estate may possess with respect thereto

## NO SUCCESSORSHIP

S.      Neither the Buyer nor any of its affiliates are successors to Arsham or its estate by reason of any theory of law or equity, and neither the Buyer nor any of its affiliates will assume or in any way be responsible for any liability or obligation of Arsham or its estate, except as otherwise expressly provided in the PSA.  None of Arsham's liabilities or obligations will be binding on the Buyer except for those liabilities and obligations that are expressly (i) assigned by Arsham and (ii) are assumed by the Buyer, in writing pursuant to the terms and conditions of the PSA.  Any liability or obligation other than as described in the preceding sentence will not be binding on the Buyer, nor will the Buyer have any liability therefor.  Except as expressly set forth in the PSA, the transfer of the Assets to the Buyer under the PSA shall not result in the Buyer having any liability or responsibility for (a) any Interest against Arsham or against an insider of Arsham, (b) the satisfaction in any manner, whether at law or in equity, whether by payment, setoff, loss of rights or remedies or otherwise, directly or indirectly, of any Claim, Lien, or Interest (as those terms are defined in Paragraph 13 herein), or (c) to third parties or Arsham, except as is expressly set forth in the PSA.  Without limiting the effect or scope of the foregoing, the transfer of the Assets from Arsham to the Buyer does not and will not subject the Buyer or its affiliates, successors or assigns or its respective properties (including the Assets) to any liability for Interests against Arsham or Arsham's Interests in such Assets by reason of such transfer under the laws of the United States or any state, territory, possession thereof, including, without limitation, any bulk transfer laws, successor liability or similar theories.  The Buyer is not a continuation of Arsham or its estate and there is no continuity between the Buyer and Arsham. The Buyer is not holding itself out to the public as a continuation of Arsham or its estate and the Sale does not amount to a consolidation, merger or de facto merger of the Buyer and Arsham and nothing in this Order shall be interpreted to deem the Buyer as the successor to Arsham under any state law successor liability doctrine with respect to any liabilities under environmental laws or regulations for penalties for days of violation

prior to Closing.  Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under applicable non-bankruptcy law.

### ASSIGNED CONTRACTS AND LEASES

T.      Arsham has demonstrated (i) that it is an exercise of their sound business judgment to assume the Assumed Contracts and assign them to the Buyer in connection with the consummation of the Sale and (ii) that the assumption and assignment of the Assumed Contracts to the Buyer is in the best interests of Arsham, its estate, its equity interest holders, its creditors, and other parties in interest.  The Assumed Contracts being assigned to the Buyer is an integral part of the Assets being purchased by the Buyer and, accordingly, such assumption, assignment and cure of any defaults under the Assumed Contracts are reasonable and enhance the value of Arsham's estate. Each and every provision of the Assumed Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed Contract have been satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.  Any non-debtor counterparty to a Assumed Contract that has not actually filed with the Court an objection to such assumption and assignment in accordance with the terms of the Motion is deemed to have consented to such assumption and assignment.

### CURE COSTS AND ADEQUATE ASSURANCE

U.      Arsham and the Buyer, as applicable, have, including by way of entering into the PSA and agreeing to the provisions relating to the Assumed Contracts therein, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and Buyer has, based upon the record of these proceedings, including the evidence proffered by Arsham at the Bid Procedures Hearing and the Sale Hearing, provided adequate assurance of its future performance of and under the Assumed Contracts pursuant to sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Buyer's promises under the PSA to perform the obligations under the Assumed Contracts after the Closing constitute adequate assurance of future performance under the Assumed Contracts being assigned to the Buyer within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The Cure Costs are hereby found to be the sole amounts necessary to cure any and all defaults under the Assumed Contracts under section 365(b) of the Bankruptcy Code and, upon payment of the portion of the Cure Costs with respect to which they are liable under the PSA, pursuant to section 365(k) of the Bankruptcy Code, Arsham shall have no further liability under the Assumed Contracts whatsoever other than to the Buyer pursuant to the PSA.

<u>**TIME IS OF THE ESSENCE; WAIVER OF STAY**</u>

V.       Time is of the essence in consummating the Sale.  In order to maximize the value of the Assets, it is essential that the sale and assignment of the Assets occur within the time constraints set forth in the PSA. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

<u>**OBJECTIONS OVERRULED**</u>

1.       All objections to the entry of this Order or to the relief granted herein, whether filed, stated on the record before this Court which could have been raised but were not or otherwise, which have not been withdrawn, waived, or settled, and all reservations of rights included therein, are denied and overruled on the merits.  All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

2.       Notice of the Motion, the Bid Procedures, the Auction, the Sale, the assumption and assignment to the Buyer of the Assumed Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

<u>**APPROVAL OF PSA; AUTHORIZATION TO SELL**</u>

3.       The PSA attached hereto as **Exhibit 1**, together with any amendments, if any, thereto is hereby approved.

4.       Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Arsham is authorized to sell the Assets to the Buyer subject to the terms of the PSA and this Order and take any and all actions necessary to fulfill its obligations under, and comply with the terms of, the PSA and to consummate the Sale pursuant to and in accordance with the terms and conditions of the PSA and this Order, without further leave of the Court.  Arsham is further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or costs that are required to be paid in order to consummate the Sale contemplated by the PSA or perform its obligations under the PSA, including breakup fees, and reimbursement of expenses, owed to the Stalking Horse Bidder (as defined in the Bid Procedures).

5.       Arsham is authorized, in accordance with the PSA, to execute and deliver, and empowered to perform under, consummate, and implement, the PSA, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the PSA, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or

reducing to possession, the Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the PSA.

6.      Subject to the terms and conditions of this Order, all entities that are in possession of some or all of the Assets on the Closing Date are directed to surrender possession of such Assets to the Buyer or its assigns on the Closing Date.

7.      The Buyer and Arsham have no obligation to proceed with the Closing unless and until all conditions precedent to their respective obligations to do so, as set forth in the PSA, have been met, satisfied or waived in accordance with the terms of the PSA.

8.      Upon consummation of the Sale, all cash proceeds of the Sale (the "**Sale Proceeds**") will be held by Hoover Slovacek LLP ("**HSLLP**") in trust. All Liens, Claims, and Interests will attach to the Sale Proceeds to the same extent and with the same priority as existed prior to consummation of the Sale.

9.      At the conclusion of the Auction, Arsham selected Icon Metal Solutions, LLC  to be the "Backup Bidder" (the "**Backup Bidder**") as defined in the Bid Procedures.

10.     If there is no closing by Friday, May 17, 2019, and no extension sought and granted pursuant to paragraph 42 of this order, Arsham shall immediately deliver a Backup Sale Notice to the Backup Bidder. Arsham and Backup Bidder shall thereafter be required to close on the Sale of the Assets, subject to the satisfaction of all conditions precedent set forth in, and otherwise as required pursuant to the terms of, the Backup Bidder's PSA  (the "**Backup PSA**"), not later than Friday May 24, 2019, and without further order of the Bankruptcy Court  (the "**Backup Sale**"). In the event Arsham closes a sale to the Backup Bidder, this Order and all relief granted herein and all protections afforded hereby shall apply to the Backup Bidder as the Buyer in such Backup Sale, and the Backup Bidder will be considered the "Buyer" for all purposes hereof, the Backup PSA shall be considered a "PSA"   for all purposes hereof and this Order and all relief granted herein, and all protections afforded hereby,   shall  apply to such Backup Sale with full force and effect and such Backup Sale shall be considered a "Sale" for all purposes hereof.

## BINDING EFFECT OF ORDER

11.     This Order and the PSA shall be binding upon all creditors of, and equity interest holders in, Arsham and any and all other parties in interest, including, without limitation, any and all holders of Liens, Claims, and Interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever, all non-debtor parties to the Assumed Contracts, the Buyer, Arsham, and any trustee or successor trustee appointed in Arsham's Chapter 11 Case or upon a conversion to chapter 7 under the Bankruptcy Code or any subsequent bankruptcy that may be filed by Arsham.  The PSA and the Sale are not subject to rejection or avoidance (whether through any avoidance, fraudulent transfer, preference or

recovery, claim, action or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal law or any other cause of action) by Arsham, any chapter 7 or chapter 11 trustee of Arsham's bankruptcy estate or any other person or entity.  The PSA, this Order, and Arsham's obligations therein and herein shall not be altered, impaired, amended, rejected, discharged or otherwise affected by any chapter 11 plan proposed or confirmed in this bankruptcy case, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the Buyer, to the extent of any conflict between this Order or any PSA and such future plan or order, the terms of this Order and the PSA shall control.

### AMENDMENTS TO PSA

12.     The PSA and any related agreements, documents, or other instruments may be modified, amended, supplemented or restated by the parties thereto in a writing signed by both parties and in accordance with the terms thereof, without further order of this Court (but with prior notice thereof), provided that (i) any such modification, amendment, supplement or restatement does not have a material adverse effect on Arsham's estate and (ii) the PSA shall not be modified to extend the closing date specified for the Successful Bidder in the Bid Procedures Order.

### TRANSFER OF THE ASSETS FREE AND CLEAR

13.     The Buyer shall assume and be liable for only those liabilities expressly assumed by Buyer pursuant to the PSA.  Except as expressly permitted or otherwise specifically provided for in the PSA or this Order, pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing, the Assets will be transferred to the Buyer free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever.  For purposes of this Order, "Liens," "Claims," and "Interests" shall mean:

a)     any and all encumbrances, charges, liens (statutory or otherwise), claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledges, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of offset, setoff and recoupment, successor liability, interests or rights under any agreement that is not a Assumed Contract, encroachments, encumbrances, restrictions on transferability of any type, any dedication under any gathering, transportation, treating, purchasing or similar agreement that is not assumed by or assigned to the Buyer, any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of Arsham's or the Buyer's interest in the Assets, any similar rights, and third-party interests or any other restrictions or limitations of any kind with respect to the Assets (collectively, "**Liens**");

b)      any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under any labor, employment or pension laws, labor or employment agreements, including any employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, (ii) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, (iii) any and all claims or causes of action based upon or relating to any unexpired and executory contract or unexpired lease to which Arsham is a party that is not a Assumed Contract that will be assumed and assigned pursuant to this Order and the PSA, (iv) any and all claims or causes of action based upon or relating to any bulk sales or similar law, (v) any and all claims or causes of action based upon or relating to any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing, including, without limitation, any ad valorem taxes assessed by any applicable taxing authority, and (vi) any and all other claims, causes of action, proceedings, warranties, guaranties, rights of recovery, setoff, recoupment, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against Arsham or any of its, officers, agents, successors or assigns in connection with or relating to Arsham, its operations, its business, its liabilities, Arsham's marketing and bidding process with respect to the Assets, the Assigned Contracts, the Assets, or the Sale contemplated by the PSA (collectively, "**Claims**"); and

c)      any and all equity or other interests of any kind or nature whatsoever in or with respect to (i) Arsham or its affiliates, subsidiaries, successors or assigns, (ii) the Assets, or (iii) the Assigned Contracts or Assigned Leases (collectively, "**Interests**");

whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing.  Any and all such Liens,

Claims, and Interests shall attach to the portion of the Sale Proceeds received by Arsham ultimately attributable to the Assets against which they assert an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Assets, subject to any claims, defenses and objections, if any, that Arsham or its estate may possess with respect thereto.

14.     Subject to and upon the occurrence of the Closing Date, except for the express rights and obligations of Arsham and the Buyer under the PSA after the Closing Date and any claims arising therefrom, Arsham, its estate, and its successors or assigns, including any trustee under the Bankruptcy Code, to the extent permitted by law, are hereby deemed to have been irrevocably and unconditionally released, remised, and forever discharged by Buyer (and, with respect to the Buyer, each of such Buyer's equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacity as such with respect to Buyer in its capacity as the Buyer under the PSA, and not with respect to any other capacity or relationship with Arsham) from any and all any and all claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever (including (x) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law, (y) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code, and (z) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code, except to the extent asserted defensively in connection with any claim or interest asserted in the bankruptcy cases), in each case whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including any derivative claims, asserted on behalf of Arsham that such entity would have been legally entitled to assert (whether individually or collectively) or which Arsham, its affiliates, its estate, or its successors or assigns might now or subsequently may have, in each case based on or relating to, or in any manner arising from, in whole or in part, the actions of the Buyer with respect to Arsham, its postpetition business or operations, this Chapter 11 Case, the Assets, the Assumed Contracts that are actually assumed by Arsham and assigned to the Buyer, the Auction, the Sale, the negotiation and documentation thereof, the transactions contemplated thereby, and the agreements and ancillary documents memorializing and effectuating such sale(including, without limitation, the PSA, but excluding the express rights and obligations of Arsham and the Buyer under the PSA after the Closing Date).

## VESTING OF ASSETS IN THE BUYER

15.     The transfer of the Assets to the Buyer pursuant to the PSA will constitute a legal, valid, and effective transfer of the Assets on the Closing, and will vest the Buyer with all of Arsham's rights, title and interests in the Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever.  Upon releasing of any Liens, the Liens will attach to the Sale Proceeds received by Arsham in the order and priority that existed prior to such releases.

## POLICE AND REGULATORY POWER OF GOVERNMENTAL UNITS

16.     Nothing in this Order or the PSA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  Nothing in this Order or the PSA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets on account of the filing or pendency of this Chapter 11 Case or, to the extent provided by section 525 of the Bankruptcy Code, the consummation of the Sale contemplated by the PSA, including, without limitation, the Sale and Arsham's assumption and assignment of the Assumed Contracts to the Buyer.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

## ASSUMPTION AND ASSIGNMENT OF ASSIGNED CONTRACTS AND ASSIGNED LEASES

17.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, Arsham's assumption and assignment of the Assumed Contracts to the Buyer is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

18.     Arsham is hereby authorized, in accordance with the PSA, and in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (i) assume and assign to the Buyer the Assumed Contracts, effective upon and subject to the occurrence of the Closing, free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever, which Assumed Contracts, by operation of this Order, shall be deemed assumed and assigned to the Buyer effective as of the Closing, and (ii) execute and deliver to the Buyer such documents or other instruments as the Buyer may deem necessary to assign and transfer the Assumed Contracts to the Buyer.

19.     Subject to the immediately preceding paragraph:

a)      Arsham is authorized to assume all of the Assumed Contracts in accordance with section 365 of the Bankruptcy Code.

b)      Arsham is authorized to assign each Assumed Contract to the Buyer in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract on the consent of the non-debtor counterparty thereto or allow the non-debtor counterparty to such Assigned Contract or Assigned Lease to terminate, recapture, impose any penalty, condition, any renewal or extension, require a net worth requirement, or modify any term or condition upon the assignment of such Assumed Contract, shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code and be void and of no force or effect.

c)      All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Assumed Contracts by Arsham to the Buyer have been satisfied.

d)      Upon the Closing, the Assumed Contracts shall be transferred and assigned to, and remain in full force and effect for the benefit of the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2), 365(e)(1) and 365(f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer.

e)      After Arsham's transfer and assignment of the Assumed Contracts to the Buyer, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of each Assumed Contract free and clear of Liens, Claims, and Interests, and all non-debtor counterparties to the Assumed Contracts are barred and enjoined from asserting against the Buyer or its assets, among other things, defaults, breaches or claims of pecuniary losses existing as of Closing or by reason of Closing.

f)      The failure of Arsham to enforce at any time prior to the Closing Date one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Buyer' rights to enforce every term and condition of the Assumed Contracts.

g)      There shall be no accelerations, assignment fees, increases, or any other fees charged to any Buyer as a result of the assumption, assignment, and sale of the Assumed Contracts.

20.     All defaults and all other obligations of Arsham under the Assumed Contracts occurring, arising or accruing prior to the assignment thereof to the Buyer at Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b )(2) of the Bankruptcy Code) are deemed to have been cured or satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assumed Contract set forth in a Cure Notice, which was served in compliance with the Bid Procedures Order, and is set forth on the schedule attached hereto as **Exhibit 2**, the Cure Costs, and which Cure Costs were satisfied, or will be satisfied as soon as practicable, by Arsham or by the Buyer, as the case may be, as provided in the PSA.  For all Assumed Contracts for which a Cure Notice was served, Arsham and the Buyer are authorized and directed to pay their respective portion of all Cure Costs required to be paid by such parties in accordance with the PSA upon the Closing. Pursuant to section 365(k) of the Bankruptcy Code, Arsham and its estate shall be relieved from any liability under any Assumed Contract that arises on or after the Closing Date, whether as a result of breach of a Assumed Contract on or after the Closing Date or otherwise other than to the Buyer pursuant to the PSA.

## AD VALOREM TAXES

21.     The ad valorem tax liens of Harris County and Cypress Fairbanks ISA (collectively, the "**Taxing Authorities**") for the 2017 and 2018 tax year are hereby expressly retained against the Assets until payment is made to fully satisfy the 2017 and 2018 ad valorem taxes, and any penalties or interest which may ultimately accrue to those 2017 and 2018 taxes.

## NO SUCCESSORSHIP OR TRANSFEREE LIABILITY

22.     Neither the Buyer nor any of its affiliates are or shall be deemed, as a result of the consummation of the Sale contemplated herein, to: (a) be legal successors to Arsham or its estate by reason of any theory of law or equity, (b) have, de facto or otherwise, merged with or into Arsham, or (c) be an alter ego or a mere continuation or substantial continuation or successor of Arsham in any respect.  Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of Arsham or its estate, except as otherwise expressly provided in the PSA or this Order.  To the fullest extended allowed by law and without limiting the effect or scope of the foregoing, as a result of the closing of the Sale, except as set forth in the PSA, the Buyer shall have no successor, derivative or vicarious liabilities of any kind or character, including, but not limited to, federal, state or other tax liabilities, or liabilities based on any theory of successor or transferee liability, antitrust, environmental, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, de facto merger or substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or

noncontingent, liquidated or unliquidated, asserted or unasserted, recorded or unrecorded, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, whether imposed by agreement, understanding, law, equity or otherwise with respect to Arsham or any obligations of Arsham, including, but not limited to, in the case of liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing, except as set forth in the PSA, or any taxes in connection with, or in any way relating to the cancellation of debt of Arsham or its affiliates, or otherwise as a result of the Sale.

## MODIFICATION OF THE AUTOMATIC STAY

23.     The automatic stay provisions of section 362 of the Bankruptcy Code are lifted and modified to the extent necessary to implement the terms and conditions of the PSA and the provisions of this Order, without further order of the Court.

## RELEASE OF LIENS BY CREDITORS; COLLECTION OF ASSETS

24.     Except as expressly provided to the contrary in this Order or in the PSA, each holder of any valid Lien, Claim or Interest against the Assets including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other persons holding Lien, Claims, or Interests of any kind or nature whatsoever against or in Arsham or Arsham's interests in the Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, whether imposed by agreement, understanding, law, equity or otherwise), arising under or out of, in connection with, or in any way relating to, Arsham, the Assets, the operation of Arsham's businesses before the Closing or the transfer of Arsham's interests in the Assets to the Buyer shall, as of the Closing, be deemed to have waived and released such Lien, Claim or Interest, without regard to whether such holder has executed or filed any applicable release, and such Lien, Claim or Interest shall automatically, and with no further action by any party, attach to the portion of the Sale Proceeds received by Arsham ultimately attributable to the Assets against which they assert an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Assets, subject to any claims, defenses and objections, if any, that Arsham, its estate, or any other party in interest may possess with respect thereto.  All such entities referenced in the preceding sentence shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Liens, Claims, or Interests against the Buyer, its successors and assigns, its affiliates and representatives or its interests in the Assets.  Notwithstanding the foregoing, any such holder of such a Lien, Claim or Interest is directed to execute and deliver any waivers, releases, or other related documentation reasonably requested by Arsham or the Buyer to evidence the release of its Liens, Claims, or Interests in the Assets.  Any person or entity that has filed any financing

statements, mortgages, deeds of trust, mechanic's liens, lis pendens, or any other documents or agreements evidencing a Lien on Arsham or any of the Assets conveyed pursuant to the PSA and this Order is directed to deliver to Arsham prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens which the person or entity has with respect to Arsham or the Assets or otherwise.

25.     In the event that such termination statements, instruments of satisfaction, or releases of all Liens are not filed in accordance with the foregoing paragraph, Arsham and the Buyer are authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Assets of any kind or nature whatsoever.

## EFFECT OF RECORDATION OF ORDER

26.     This Order, if filed, registered, or otherwise recorded, shall be effective as a conclusive determination that, upon the Closing, all Liens, Claims and Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected; however, this Order is binding and effective regardless of whether any such filing, registration or recordation occurs.  The Liens, Claims and Interests that are unconditionally released, discharged, and terminated pursuant to this Order include, without limitation, those certain Liens, Claims, and Interests evidenced by the financing statements (as they pertain to the Assets), mortgages, deeds of trust, mechanic's liens, lis pendens, notations of liens on certificates of title etc.

27.     This Order, if filed, registered, or otherwise recorded, shall be binding upon and shall govern the acts of all persons and entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local officials, notaries, protonotaries, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Assets; however this Order is binding and effective regardless of whether any such filing, registration or recordation occurs.

28.     Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale contemplated by the PSA, including, without limitation, recordation of this Order.

## PROHIBITION OF ACTIONS AGAINST THE BUYER

29.    Except as expressly permitted or otherwise specifically provided for in the PSA or this Order, the Buyer and its affiliates shall have no liability or responsibility for any liability or other obligation of Arsham arising under or related to the Assets or otherwise.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the PSA, the Buyer and its affiliates shall not be liable for any Claims against Arsham or any of their predecessors or affiliates, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to Arsham or any obligations of Arsham, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Arsham's business prior to the Closing.

30.    Effective upon the Closing, with the sole exception of any enforcement of rights related to the liabilities assumed by the Buyer pursuant to the PSA, all persons and entities shall be, and hereby are, forever barred and estopped from (a) taking any action that would adversely affect or interfere with the ability of Arsham to transfer the Assets to the Buyer in accordance with the terms of this Order and the PSA and (b) asserting, prosecuting, or otherwise pursuing, whether in law or in equity, in any judicial, administrative, arbitral or other proceeding, any Liens, Claims or Interests of any kind or nature whatsoever against the Buyer and its successors, designees, assigns, or property, or the Assets conveyed under this Order in accordance with the PSA.

## NO INTERFERENCE

31.    Following the Closing, no holder of a Lien, Claim and/or Interest in or against Arsham or the Assets shall interfere with any Buyer's title to or use and enjoyment of the Assets based on or related to such Lien, Claim, and/or Interest or based on any actions Arsham may take in its Chapter 11 Case.  Moreover, following the entry of this Order, no unsuccessful Bidder (including the Back Up Bidder, and its respective officers, directors, employees, owners and representatives) will directly or indirectly interfere with the Buyer's consummation of the transactions contemplated in the PSA and/or contact the Buyer to influence them with respect to fulfilling its obligations under the PSA.

## RETENTION OF JURISDICTION

32.    This Court retains jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce and implement the terms and provisions of this Order and the PSA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, without limitation, retaining jurisdiction to: (a)

compel delivery of the Assets or performance of other obligations owed to the Buyer; (b) compel performance of obligations owed to Arsham and/or the Buyer; (c) resolve any disputes arising under or related to the PSA; (d) interpret, implement, and enforce the provisions of this Order; (e) compel delivery of any waivers, releases, or other related documentation reasonably requested by Arsham or the Buyer to evidence the release of any Liens, Claims, or Interests in the Assets; (f) protect the Buyer and its affiliates against (i) any Liens, Claims and Interests in or against Arsham, the Buyer, or the Assets of any kind or nature whatsoever and (ii) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets to the Buyer that may be in its possession; and (g) protect the Buyer and Arsham and their affiliates against any liabilities (other than any liabilities retained by Arsham or assumed by Buyer under the PSA) in any way relating to the Assets arising on or after the Closing Date other than to the Buyer pursuant to the PSA.

## NO STAY OF ORDER

33.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, Arsham and the Buyer are free to close the Sale under the PSA at any time pursuant to the terms thereof.  The Sale contemplated by the PSA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyer (including the assumption and assignment by the Debtor of any of the Assigned Contracts or Assigned Leases), unless such authorization is duly stayed pending such appeal.

## GOOD FAITH PURCHASERS

34.     The Sale contemplated by the PSA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyer has acted without collusion in undertaking the Sale contemplated by the PSA.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyer (including the assumption and assignment by Arsham of any of the Assumed Contracts), unless such authorization is duly stayed pending such appeal.  Buyer is a buyer in good faith of the Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

35.     There has been no showing that Arsham or the Buyer engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

### INCONSISTENCIES WITH PRIOR ORDERS, PLEADINGS OR AGREEMENTS

36.     To the extent of any conflict between the PSA and this Order, the terms of the PSA will govern the rights and obligations of the parties thereto; provided however that the PSA may not hereafter be modified or amended except as provided under Section 12 above.  For the avoidance of doubt, Arsham's available remedies against the Backup Bidder shall be limited to those remedies specified in the Backup PSA, including as stated in Section 13.2 thereof.  To the extent this Order is inconsistent or conflicts with any prior order or pleading in this Chapter 11 Case, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.  For the avoidance of doubt, if Arsham's Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the Order shall be binding on the chapter 7 trustee in such chapter 7 case.

### FAILURE TO SPECIFY PROVISIONS

37.     The failure to specifically reference any particular provisions of the PSA or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the PSA and other related documents be authorized and approved in their entirety.

### SURCHARGE

38.     Arsham reserves the right to surcharge the Sale Proceeds pursuant to 11 U.S.C. § 506(c).

### NON-SEVERABILITY

39.     The provisions of this Order are non-severable and mutually dependent.

### ADDITIONAL PROVISIONS

40.     Upon the closing of the Sale to Buyer, Backup Bidder shall be entitled to the amounts provided in Section 6.2 of the Backup PSA, as provided in Section A.4 of the Bid Procedures Order. The Backup Bidder shall be entitled to interest upon its Good Faith Deposit as stated in Section 12b of the Bid Procedures Order.

41.     The provisions of Section 18 of the Bid Procedures ("Reservation of Rights")  shall not apply following the date of this Order.

42.     Notwithstanding any other provision of this Order, or the PSA, in the event that the Sale to the Buyer is not closed on or before Friday, May 17, 2019, no extension of such closing date for the Sale to the Buyer shall be effective except upon order entered by the Bankruptcy Court after notice and hearing.


**Signed:  May 10, 2019**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT 1
### PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "Agreement") is entered into between **ARSHAM METAL INDUSTRIES, INC.**, a Texas corporation (the "Seller"), and **11280 CHARLES ROAD, L.P.**, a Texas limited liability partnership, or assigns (the "Buyer").

Seller hereby agrees to convey to Buyer, and Buyer hereby agrees to purchase from Seller, the following described property upon the following terms and conditions:

1.    Property.  The property ("Property") consists of the following described Land and other property interests situated in Harris County, Texas:

1.1    Real Property.  The Land consists of (i) a tract of land located at 11280 Charles Road, Houston, Harris County, Texas, LT 36B FAIRVIEW GARDENS SEC 1 PAR R/P 4.3625 AC (HCAD 064-015-000-0036), as more particularly described on Exhibit "A" attached hereto and incorporated herein for all purposes (the "Land"), together with (a) all buildings, structures, fixtures and improvements situated on, in or under the Land (the "Improvements"), and (b) all of Seller's right, title and interest in and to the appurtenances pertaining to the Land (hereinafter collectively referred to as the "Appurtenant Property"), including, but not limited to, all right, title and interest of Seller in and to adjacent roads, rights-of-way, alleys, drainage facilities, easements and utility facilities and strips and gores between the described Land and abutting properties, if any.  The Land, Improvements, and Appurtenant Property are sometimes hereinafter referred to as the "Real Property".

1.2    Personal Property.  Except for the tangible and intangible personal property listed on Schedule 1.2(a) attached hereto (the "Excluded Personal Property"), all personal property set forth on Schedule 1.2(b) attached hereto (the "Scheduled Personal Property"), together with all of Seller's right, title and interest in any personal property owned by Seller as of the date hereof and all of Seller's right, title and interest in any personal property owned by Seller on the date of Closing, including, without limitation, all inventory, furniture, furnishings, fixtures, fittings, appliances, apparatus, equipment, tools, machinery, maintenance supplies, heating, ventilating, air-conditioning, incinerating, lighting, plumbing and electrical fixtures, hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment, contract rights, claims, systems, names, "doing business as" names, goodwill, trademarks, websites, domain names, e-commerce names, social media accounts, email addresses, telephone numbers, facsimile numbers, logos, customer information, vendor information, books, records, files and other items of tangible and intangible personal property (collectively hereinafter referred to as the "Personal Property").

1.3    Licenses and Permits.  To the extent assignable by Seller to Buyer all of Seller's right, title and interest in and to (i) licenses, permits, certificates of occupancy, or similar documents relating to the Real Property and Personal Property, and (ii) plans, drawings, specifications, surveys, engineering reports and other technical descriptions of the Real Property, if any (collectively, the "Licenses and Permits").

Notwithstanding anything herein to the contrary, the Agreement described herein is subject to the approval by the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") of the sale of the Property to Buyer (the "Bankruptcy Court Approval Date").

2.      Earnest Money.  At the time this Agreement is fully executed by Buyer and Seller, Seller shall cause to be deposited with Stewart Title Guaranty Company (the "Title Company"), Attention:  Phyllis Ocean (the "Escrow Agent") (i) this Agreement and (ii) the Good Faith Deposit (as defined in the bidding procedures (the "Bidding Procedures") approved by order of the Bankruptcy Court at Docket No. 69 (the "Bidding Procedures Order")) in the sum of ONE HUNDRED FIFTY-FIVE THOUSAND and No/100 Dollars ($155,100.00), as earnest money (the "Earnest Money").  The Title Company shall invest the Earnest Money in an interest-bearing account and all interest earned thereon shall be deemed part of the Earnest Money.  At the Closing of this sale any cash held by the Title Company as the Earnest Money shall be applied towards the Purchase Price to be paid by Buyer hereunder.  If this Agreement is terminated in accordance with the terms and conditions hereof, the Earnest Money shall be paid as provided herein.

3.      Purchase Price.  The total purchase price (the "Purchase Price") for the sale and purchase of the Property is THREE MILLION ONE-HUNDRED THOUSAND and No/100 Dollars ($3,100,000.00). The Purchase Price shall be payable by Buyer in good funds.   The Purchase Price is allocated as follows: (i) $87,000.00 for the Break-Up Fee (as defined in the Bidding Procedures); (ii) $1,706,500.00 for the sale and purchase of the Real Property; and $1,306,500.00 for the sale and purchase of the remainder of the Property. As used herein the term "good funds" shall mean (a) cash or wire transfers, (b) cashier's check, (c) certified check, (d) teller's check, or (e) any other instrument which is the functional equivalent of a cashier's, certified or teller's check.

4.      Closing.

        4.1     Date of Closing.  The sale of the Property shall be closed (the "Closing") at the offices of the Title Company on the following date (the "Closing Date"): (i) in the event that the Bidder is the successful Bidder, as that term is defined in the Bidding Procedures, May 17, 2019, or on such earlier date as may be agreed upon by Seller and Buyer or (ii) in the event that the Bidder is the Backup Bidder, and receives a Backup Sale Notice, as both terms are defined in the Sale Motion, May 24, 2019, or such earlier date as may be agreed upon by Seller and Buyer.

5.      Documents to be Delivered at Closing.  The following shall be delivered at Closing:

        5.1     Purchase Price.  Buyer shall cause to be delivered to Seller the Purchase Price, in good funds, as described in Section 3, above, less the Earnest Money and subject to any adjustment provided herein.

        5.2     Deed.  Seller shall furnish at Seller's expense a special warranty deed executed and acknowledged by Seller (the "Deed") in the form attached hereto as Exhibit "B".

The Deed shall convey good and indefeasible fee simple title to the Real Property, free and clear of all restrictions, conditions, easements, liens, and other encumbrances.

5.3     Title Policy.  Buyer shall cause the Title Company to furnish to Buyer, at Seller's expense, a standard form Owner's Policy of Title Insurance issued by Title Company in the form prescribed by the Texas Department of Insurance issued by an underwriter selected by Buyer.  The policy shall be in the amount of the total Purchase Price of the Real Property and shall guarantee that Buyer's title to the Real Property is good and indefeasible subject only to the following exceptions:

   5.3.1   Items disclosed to Buyer and approved by Buyer in accordance with the terms of this Agreement.

   5.3.2   Any taxes not yet due for the year in which the Closing occurs.

   5.3.3   Government rights of police power or eminent domain unless notice of the exercise of such right appears in the public records as of the date hereof and the consequences of any law, ordinance or governmental regulation, including but not limited to building and zoning ordinances.

   5.3.4   All other standard printed exceptions set out on a standard form Owner's Policy of Title Insurance issued by Title Company in the form prescribed by the Texas Department of Insurance without any extended coverages.

   5.3.5   Buyer may, at Buyer's option and expense, cause the Title Company to delete from the Title Policy the exceptions as to discrepancies in areas or boundaries, encroachments or overlapping of improvements, except "shortages in area".  If the Survey is accepted by the Title Agent, Seller shall execute any survey affidavit with respect to the Survey reasonably requested by the Title Company to allow the Title Company to amend the survey exception in the Owner Title Policy on the Property issued at Closing to read "shortages in area".

5.4     Assignment of the Contracts, Licenses and Permits.  Seller shall execute and deliver to Buyer an Assignment and Assumption in substantially the form attached hereto as Exhibit "C" assign to Buyer all of its right, title and interest in the Contracts, Licenses and Permits listed in Schedule 7.4 (the "Assumed Contracts") and Buyer shall assume all of the obligations under the Assumed Contracts from and after the Closing Date.

5.5     Bill of Sale.  Seller shall execute and deliver to Buyer a Bill of Sale in substantially the same form attached hereto as Exhibit "D" conveying the Scheduled Personal Property to Buyer free and clear of all restrictions, conditions, easements, liens, and other encumbrances, together with the remainder of the Personal Property.

3

5.6     <u>Vehicles Titles</u>.  All titles to any vehicles included as Personal Property, if any, free and clear of all restrictions, conditions, easements, liens, and other encumbrances.

5.7     <u>Foreign Person Affidavit</u>.  At Closing, Seller shall deliver to Buyer an affidavit certifying the fact that Seller is not a "Foreign Person" as that term is defined in the Internal Revenue Code of 1986, as amended (the "<u>Code</u>").

5.8     <u>Authority to Execute Documents</u>.  Seller and Buyer shall each deliver to the other and the Title Company documentation sufficient to evidence that each has the requisite authority to execute documents for Closing this sale.

5.9     <u>Records and Other Documents</u>.   Originals (or if originals are not in Seller's possession, copies) of, and electronic files of (as applicable) (i) transferable warranties, guaranties which Buyer will assume or to which it would be a beneficiary pursuant to an agreement, (ii) operating manuals in Seller's possession or subject to Seller's control issued by manufacturers or suppliers with respect to Personal Property to be acquired and all other documents pertaining to the continued operation or maintenance of the Property, and (iii) all books, records and files of Seller to the extent related to the Property and not previously delivered to Buyer, including, without limitation, sales and service records, books of account, invoices, inventory records, accounting records, environmental records and studies, maintenance records, cost and pricing information, supplier and vender lists, business plans, catalogues, quality control records and manuals, blueprints, research and development files, and patent and trademark files.

5.10    <u>Keys and Passwords</u>.  All keys used in connection with the operation of the Property and all log-in or password information used for software or electronic accounts or access shall be delivered to Buyer.

5.11    <u>Property</u>.  Seller shall deliver possession of the Property at Closing.

5.12    <u>Other Matters</u>.  Seller and Buyer shall each deliver any such other matters as may be required herein or reasonably required by the Title Company.

5.13    <u>Sale Order</u>. The Sale Order, in form and substance reasonably acceptable to Buyer and Seller, shall have been entered by the Bankruptcy Court prior to the Closing and such order shall be a final order and in full force and effect.

6.     <u>Prorations</u>.  Seller and Buyer agree to prorate the following items relating to the operations of the Property effective, as of 11:59 p.m., Central Time (the "<u>Proration Time</u>"), on the day prior to the date the Closing occurs (collectively, the "<u>Proration Items</u>"):

6.1     <u>Real Estate Taxes and Assessments</u>.  Ad valorem taxes and assessments payable for the calendar year in which Closing occurs shall be prorated as of the Proration Time such that Seller will be charged and credited for the amounts of all of such ad valorem taxes and assessments relating to the period up to and including the Proration Time, and Buyer will be charged and credited for all of such ad valorem

taxes and assessments relating to the period after the Proration Time.  If the current year's ad valorem taxes are not known as of Closing, the parties shall, upon Closing, pro rate the current year's ad valorem taxes based on the previous year's tax rate applied against the most recent assessed valuation.  Any and all expenses incurred or to be incurred in connection with any real estate tax appeals that are pending at the time of Closing shall be prorated in the same manner as ad valorem taxes set forth above.

6.2     <u>Utilities and Other Operating Expenses</u>.  All utility charges payable by Seller, including, without limitation, electricity, gas, water charges and sewer charges and other operating expenses with respect to the Property shall be prorated between Seller and Buyer as of the Proration Time.  If there are meters on the Real Property, Seller will cause readings of all said meters to be performed not more than five (5) days prior to the Closing Date, and an estimated per diem adjustment shall be made for the days between the meter reading date and the Closing Date based on the most recent meter reading.  Buyer shall take all reasonable steps necessary to effectuate the transfer of all utilities to its name as of the Closing Date, and where necessary, post deposits with the utility companies, <u>provided</u>, Seller shall reasonably cooperate with such efforts.  Seller shall be entitled to recover any and all deposits held by any utility company as of the Closing Date.

6.3     <u>Other Costs</u>.  Each party shall be responsible for paying its own attorneys' fees associated with negotiating, preparing, and closing the transaction contemplated by this Agreement. Seller is responsible for the cost of the basic premium for the Title Policy, one-half (1/2) of any escrow fees assessed by the Title Company, transfer taxes, mortgage taxes, and mortgage or transfer stamps. Buyer is responsible for one-half (1/2) of any escrow fees assessed by the Title Company, the cost for the amendment to the standard survey exception on the Title Policy and any title endorsements, any Mortgagee Title Policies, and any filing fees for the conveyance documents. All other closing expenses shall be allocated between the parties in the customary manner for sales of real property similar in nature to the Property and located in Harris County, Texas.

6.4     <u>Closing Statement Adjustments</u>.  The proration shall be paid at Closing by Buyer to Seller (if the prorations result in a net credit to Seller) or by Seller to Buyer (if the prorations result in a net credit to Buyer) by increasing or reducing the cash to be delivered by Buyer in payment of the Purchase Price at the Closing.  If the actual amounts of the Proration Items are not known as of the Closing, the prorations will be made at Closing on the basis of the best evidence then available and shall be deemed final for all purposes hereunder  No prorations will be made in relation to insurance premiums, and Seller's insurance policies will not be assigned to Buyer.

6.5     <u>Ash Removal; Equipment Leases</u>.

        6.5.1   Seller stipulates that there is certain ash stored in a structure located on the Real Property that requires removal (the "<u>Ash</u>"). Prior to Closing Seller shall, at its sole cost and expense, remove the Ash from the Real Property.

5

       6.5.2   Seller shall be responsible for all Cure Costs related to any Assumed Contracts.

6.6   <u>Survival</u>.  The obligations of each party under this Section 7 shall be Surviving Obligations.

7.   <u>Allocation of Purchase Price</u>.  The parties agree that this transaction will be treated as an asset acquisition for tax purposes.  Within thirty (30) days after the Closing Date, Buyer shall prepare and provide a proposed allocation of the Purchase Price among the Property (the "<u>Purchase Price Allocation</u>") to the Seller.  Such proposed Purchase Price Allocation shall be in accordance with Section 1060 of the Code and final and binding on the Parties unless, within thirty (30) calendar days after Buyer provides such proposed Purchase Price Allocation, Seller notifies Buyer of their disagreement with any item in such proposed allocation.  In the event of such notification, Seller and Buyer shall negotiate in good faith to resolve such dispute; <u>provided</u>, <u>however</u>, that if Seller and Buyer cannot resolve such dispute within thirty (30) calendar days then they shall be entitled to file separate allocations.  Any allocation of the Purchase Price agreed to pursuant to this Section shall be binding on Buyer and Seller for all tax reporting purposes except that neither party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any tax audit, claim, or similar proceedings.  The Purchase Price Allocation shall be for tax purposes only, and the Purchase Price Allocation shall not have any effect on any other distribution or disbursement of monies to secured or unsecured creditors in the bankruptcy proceeding described herein.

8.   <u>Continued Operation of the Property</u>.  Seller shall, from the Effective Date to Closing, (a) operate and maintain the Property in substantially the same manner as it is now operated and maintained, reasonable and ordinary wear and tear excepted, and as required by any applicable contract or by applicable law; (b) conduct its business in substantially the same manner as it is now conducted and as required by applicable law and maintain its books and records in the usual, regular and ordinary manner; (c) not merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence; (d) not sell, lease, assign, transfer or otherwise dispose of any material assets or properties that would be Property at Closing other than inventory sold, consumed or disposed of in the regular manner; (e) not enter into any material contracts; (f) not assume, assign, reject, terminate or materially amend any Assumed Contract; (g) fail to keep in full force and effect present insurance policies, binders, contracts, instruments or other comparable insurance benefitting the Property; and (h) not take any action that would knowingly result in a failure to comply in all material respects with all governmental laws rules or regulations applicable to the Property.

9.   <u>Casualty and Condemnation</u>.

9.1   <u>Casualty</u>. In the event all or any portion of the Property is damaged to a Material Extent (as defined herein) by fire or any other casualty between the date hereof and the Closing, Buyer, as its sole and exclusive remedy, shall have the right to either (a) terminate this Agreement by giving written notice to Seller, in which event this

Agreement shall be terminated, the Earnest Money shall be refunded to Buyer and neither party shall have any further obligations hereunder other than the Surviving Obligations, or (b) consummate Closing without any reduction of the Purchase Price in accordance with the terms of this Agreement, the net proceeds of any insurance collected by Seller prior to Closing and the amount of any applicable deductible under the insurance policy(ies) maintained by Seller with respect to the Property as of the date hereof will be paid to Buyer at Closing, and all unpaid claims and rights of Seller under such insurance that have not been collected by the time of Closing shall be assigned to Buyer at Closing. In the event insurance claims or proceeds are not assignable to Buyer for any reason, including due to circumstances related to the bankruptcy proceeding described herein, Seller will work with Buyer to negotiate a cash payment of such proceeds from Seller to Buyer post-Closing and will work to secure any order from the Bankruptcy Court necessary to approve or facilitate this cash payment. In the event such assignment cannot be made, Buyer shall have the right to terminate this Agreement, in which event the Earnest Money shall be refunded to Buyer. As used herein, "Material Extent" means any loss or damage to the Property caused by fire or other casualty, the cost to repair of which is greater than five percent (5%) of the Purchase Price, as reasonably determined by agreement of Seller and Buyer.

9.2    <u>Condemnation</u>. In the event of any taking or condemnation for any public or quasi-public purpose or use by any competent authority in appropriate proceedings or by any right of eminent domain of all or any portion of the Property (i.e. loss of access or a portion of the improvements so that operation of the Property is materially interfered with as determined by Buyer in its reasonable discretion) between the date hereof and the Closing, Buyer shall have the right to either (a) terminate this Agreement, in which event the Earnest Money shall be refunded to Buyer and neither Buyer nor Seller shall have any further rights or liabilities hereunder other than the Surviving Obligations, or (b) proceed with Closing in accordance with this Agreement, in which event, Seller shall be relieved of its duty to convey title to the portion so taken or condemned, and Buyer will be entitled to receive all proceeds of any such taking or condemnation; <u>provided</u> Seller will make no adjustment or settlement of such condition without Buyer's consent and will take at Closing all action necessary to assign its entire interest in any such award to Buyer. In the event such assignment cannot be made, Buyer shall have the right to terminate this Agreement, in which event the Earnest Money shall be refunded to Buyer.

10.    <u>Representation and Warranties</u>.

10.1    <u>Seller Representation and Warranties.</u> Seller represents and warrants that, as of the Effective Date:

10.1.1    <u>Authority of Seller</u>. Seller is a validly existing business entity duly formed and authorized to do all things required of it under the terms of this Agreement. The execution and delivery of this Agreement and the performance of Seller's obligations hereunder have been duly authorized by

all necessary action on the part of Seller, and this Agreement constitutes the legal, valid and binding obligation of Seller.

10.1.2  <u>No Violations</u>.   The execution by Seller of this Agreement and the consummation by Seller of the transaction contemplated hereby do not result in and at Closing will not result in, a breach of any of the terms or provisions of, or constitute a default or a condition which upon notice or lapse of time or both will ripen into a default under any indenture agreement, instrument or obligation which Seller is a party to and by which the Property or any portion thereof is bound.

10.1.3  <u>No Condemnation</u>.  Other than as set forth in the records to be provided by Seller to Buyer pursuant to the terms of this Agreement Seller has received no written notices from a governmental or quasi-governmental agency authorized to carry out condemnation matters relating to the Property or informing the Seller of condemnation proceedings that may be pending against the Property.

10.1.4  <u>No Litigation</u>.  Other than as set forth in the records to be provided by Seller to Buyer pursuant to the terms of this Agreement Seller has not received written notice of any pending or threatened lawsuits by adjoining landowners or others affecting the Property.

10.1.5  <u>Title</u>.   Seller has good and indefeasible title to the Real Property and Scheduled Personal Property, free and clear of all liens and encumbrances except those exceptions Seller is obligated to cause to be released at or prior to Closing.

10.1.6  <u>Liens</u>.  There will be no unrecorded liens, assessments, or security interests against the Property upon the Closing Date which will not be satisfied out of the Purchase Price of the Property.

10.1.7  <u>Leases</u>.  There are no leases covering any part of the Property and no other person or entity other than Seller currently owns or has any legal or equitable interest in the Property.  No other person or entity other than Buyer has or will have the right to acquire the Property and Buyer shall have full right to possession of the Property after Closing.

10.1.8  <u>Compliance</u>.  To Seller's knowledge, Seller has conducted its business and its operations in material compliance with and will on the Closing Date be in material compliance with all applicable laws, regulations, ordinances, rules and requirements as to the Property. Seller has not received any written notice that the Property is in violation of any private deed restriction or any law, ordinance or regulation, or any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located including, without limitation, those relating to building, zoning, platting, environmental matters and hazardous waste, and no claim, action, suit or proceeding, to Seller's actual

8

knowledge, is pending or threatened against or affecting Seller or affecting the Property, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or entity wherever located, with respect to the Property. All licenses, permits, certificates and other approvals required for the Seller to conduct its business and its operations as presently conducted have been obtained by Seller and are valid and in full force and effect.

10.1.9 <u>Taxes</u>. All taxes payable with respect to the operation, ownership or control of the Property which are allocable to the period ending on the Closing Date, and all prior periods, shall be or have been paid by Seller, and Seller shall be responsible for the timely filing of all returns or other documents required by any taxing authority claiming jurisdiction with respect to any such taxes.

10.1.10 <u>Preferential Rights</u>. There are no rights of first refusal, preferential rights to purchase, or other options or rights existing in favor of any party granting to such party the right to purchase all or any portion of the Property.

10.1.11 <u>Bankruptcy Filings</u>. There are no material misrepresentations in any document filed by Seller with the Bankruptcy Court.

10.1.12 <u>Financial Statements</u>. All financial data provided to Buyer by Seller is true, correct, and complete in all material respects, including without limitation all financial statements of Seller included in the virtual data room made available to Buyer.

10.1.13 <u>Inventory</u>. Seller warrants to provide to Buyer at Closing, as part of the Property, One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) of inventory, valued based upon the lower of cost or market method. At Closing, Buyer will pay to Seller any inventory value over One Hundred Twenty-Five Thousand ($125,000.00) as determined using the lower of cost or market valuation method. Seller will provide a credit against the Purchase Price at Closing for any shortage of inventory from the required One Hundred Twenty-Five Thousand ($125,000.00) delivery of inventory at Closing.

10.1.14 <u>Limitation of Seller's Representations and Warranties</u>. For the purposes of this Agreement, the "best of Seller's knowledge", "actual knowledge of Seller" and words of similar effect shall mean the present actual (as opposed to constructive or imputed) knowledge, as of the Effective Date, solely of Sheldon Arsham or Jeff Arsham without any independent investigation or inquiry whatsoever; provided, Seller represents and warrants to Buyer that Sheldon Arsham, in his capacity as President of Seller, and Jeff Arsham, in his capacity as chief operating officer of Seller, is each familiar with and has knowledge of the Property. No provision herein, however, shall give rise to any personal liability to the foregoing named individuals. In the event that any of Seller's representations or warranties in this Agreement

9

become untrue or materially inaccurate between the Effective Date and the Closing Date, Seller shall promptly notify Buyer of same before Closing, whereupon Buyer shall have, as its sole and exclusive alternative remedies, the right in its sole discretion to either (i) terminate this Agreement within five (5) days of receipt of notice from Seller of such fact by giving written notice of termination to Seller within said period, whereupon the Earnest Money and Buyer's Expenses shall be promptly paid to Buyer and the parties shall have no further obligations hereunder other than the Surviving Obligations, (ii) waive any claim or cause of action relating to such fact and proceed to Closing or (iii) extend the Closing for a period of time not to exceed ten (10) days in order that Seller may attempt to cure the default.

10.2    <u>Buyer Representation and Warranties.</u>  Buyer makes the following representations and warranties as of the Effective Date, all of which shall be true as of the date of Closing and all of which shall be Surviving Obligations:

10.2.1    <u>Authority of Buyer</u>.  Buyer is a validly existing business entity duly formed and authorized to do all things required of it under the terms of this Agreement. The execution and delivery of this Agreement and the performance of Buyer's obligations hereunder have been duly authorized by all necessary action on the part of Buyer, and this Agreement constitutes the legal, valid and binding obligation of Buyer.

10.2.2    <u>No Violations</u>. The consummation by Buyer of the transactions contemplated hereby will not violate any judgment, order, injunction, decree, regulation or ruling of any court or Authority or conflict with, result in a breach of, or constitute a default under the organizational documents of Buyer, any note or other evidence of indebtedness, any mortgage, deed of trust or indenture, or any lease or other material agreement or instrument to which Buyer is a party or by which it is bound.

10.2.3    <u>Anti-Terrorism Laws</u>.  Buyer is not and shall not be, and, after making due inquiry, no person or entity ("<u>Person</u>") who owns a controlling interest in or otherwise controls Buyer is or shall be, (i) listed on the Specially Designated Nationals and Blocked Persons List (the "<u>SDN List</u>") maintained by the Office of Foreign Assets Control ("<u>OFAC</u>"), Department of the Treasury, and/or on any other similar list ("Other Lists" and, collectively with the SDN List, the "<u>Lists</u>") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation (collectively, "OFAC Laws and Regulations"); or (ii) a Person (a "<u>Designated Person</u>") either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (B) designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or similarly designated under any related enabling legislation or any other similar Executive Orders (collectively, the "<u>Executive Orders</u>"). The OFAC Laws and Regulations and the Executive Orders are collectively

referred to in this Agreement as the "Anti-Terrorism Laws".  Buyer also shall require, and shall take reasonable measures to ensure compliance with the requirement, that no Person who owns any other direct interest in Buyer is or shall be listed on any of the Lists or is or shall be a Designated Person. This paragraph shall not apply to any Person to the extent that such Person's interest in the Buyer is through a U.S. Publicly-Traded Entity.  As used in this paragraph, "U.S. Publicly-Traded Entity" means a Person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a Person.

10.3 **Disclaimer of Warranties: "As Is" Conveyance.** **AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT: (I) BUYER HAS CONDUCTED ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF ALL ASPECTS OF THE PROPERTY, (II) OTHER THAN AS EXPRESSLY SET OUT HEREIN, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR STATEMENTS OF SELLER OR ITS AGENTS, AND (III) BUYER IS RELYING ON SUCH INDEPENDENT INVESTIGATION AND INSPECTION AND IS NOT RELYING ON ANY INFORMATION PROVIDED BY SELLER, SELLER'S ENGINEERS OR THE BROKERS IN DETERMINING WHETHER TO PURCHASE THE PROPERTY.**

**AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT: EXCEPT FOR SELLER'S EXPRESS WRITTEN REPRESENTATIONS, WARRANTIES AND COVENANTS EXPRESSLY SET OUT IN THIS AGREEMENT OR IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO:  (A) THE NATURE, QUALITY, OR CONDITION OF THE PROPERTY; (B) THE INCOME TO BE DERIVED FROM THE PROPERTY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON IN THE FUTURE; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, INCLUDING, BUT NOT LIMITED TO, ANY STATE OR FEDERAL ENVIRONMENTAL LAW, RULE OR REGULATION; (E) THE HABITABILITY, MERCHANTABILITY, OR FITNESS OF THE PROPERTY FOR A PARTICULAR PURPOSE; OR (F) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY**

11

(COLLECTIVELY THE "<u>DISCLAIMED MATTERS</u>").  BUYER HEREBY WAIVES ANY SUCH OTHER EXTRA-CONTRACTUAL REPRESENTATION, WARRANTY, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES.

AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT EXCEPT AS EXPRESSLY SET OUT IN THIS AGREEMENT OR IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, SELLER IS CONVEYING THE PROPERTY TO BUYER "AS IS" "WHERE IS," AND WITH ALL FAULTS AND EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS, OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE SELLER.

WITHOUT IN ANY WAY LIMITING ANY PROVISION OF THIS SECTION 11.3, BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET OUT IN THIS AGREEMENT OR IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST SELLER, AND SELLER'S PARTNERS, OFFICERS, AND AGENTS WITH RESPECT TO (i) THE DISCLAIMED MATTERS, (ii) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (iii) THE PAST, PRESENT OR FUTURE CONDITION OR COMPLIANCE OF THE PROPERTY WITH REGARD TO ANY ENVIRONMENTAL PROTECTION, POLLUTION CONTROL OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980 (HEREIN CALLED "<u>CERCLA</u>"), AND (iv) ANY OTHER STATE OF FACTS THAT EXISTS WITH RESPECT TO THE PROPERTY; <u>*PROVIDED*</u>, <u>*HOWEVER*</u>, THE FOREGOING WAIVER, RELEASE AND DISCHARGE DOES NOT WAIVE, RELEASE, OR DISCHARGE ANY CLAIM BUYER MAY HAVE AGAINST SELLER PURSUANT TO THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN (DURING THE PERIOD FOR WHICH SUCH EXPRESS REPRESENTATIONS AND WARRANTIES SURVIVE) OR IN THE DOCUMENTS TO BE DELIVERED AT CLOSING.

THE FOREGOING PROVISIONS SHALL BE CONTAINED IN THE DEED FROM SELLER TO BUYER AND SHALL SURVIVE THE CLOSING IN ALL RESPECTS.

11.    <u>Default</u>.

11.1    <u>Seller's Default</u>.  Except as set out herein for Surviving Obligations, if: (a) Seller fails to comply with any of the provisions of this Agreement, or (b) Seller is found, as reasonably determined by Buyer, to have materially misrepresented its ownership of the Scheduled Personal Property; then, in either event, Buyer may at its sole discretion, as its sole and exclusive remedy: (i) terminate this Agreement and receive back the Earnest Money, and Seller shall reimburse Buyer its Buyer's Expenses whereupon neither party hereto shall have any further duties, responsibilities, and obligations under this Agreement except for those duties, responsibilities, and obligations which expressly survive the termination hereof, or (ii) enforce specific performance of this Agreement.  Buyer must provide invoices and reasonable backup documentation in support of such Buyer's Expenses.  If Buyer fails to enforce specific performance of this Agreement in a timely manner under this Section, Buyer shall be deemed irrevocably and conclusively to have elected to terminate this Agreement and to obtain a refund of the Earnest Money and payment of Buyer's Expenses under clause (i) above as its sole and exclusive remedy against Seller.  Except as set out herein relating to Surviving Obligations, Buyer specifically waives its rights to sue Seller for damages for Seller's failure to perform any of its obligations hereunder or relating hereto.

11.2    <u>Buyer's Default</u>.  Except as set out herein for Surviving Obligations, if Buyer fails to comply with any provision of this Agreement Seller may, as its sole and exclusive remedy, terminate this Agreement and receive the proceeds of the Earnest Money deposited during the term of this Agreement, as liquidated damages. Buyer and Seller agree that such sum shall be liquidated damages for a default by Buyer hereunder for those matters other than Surviving Obligations, and because of the difficulty, inconvenience and uncertainty of ascertaining actual damages for such default, Buyer and Seller agree such sums to be reasonable and appropriate damages for such default.

11.3    <u>Return of Earnest Money</u>.  If either party is entitled to any sums held in escrow by Escrow Agent under any provision of this Agreement, the other party agrees to deliver, upon written request of the party entitled to such amounts, any instructions that may be reasonably necessary to cause the Escrow Agent to deliver such amounts held by Escrow Agent to the party entitled thereto.

11.4    <u>Attorneys' Fees and Costs</u>.  In the event of any lawsuit between the parties pertaining to this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees, expenses, and other court costs.

11.5    <u>Bankruptcy Court Approval</u>. Buyer stipulates, acknowledges and agrees that this Agreement, and Seller's obligations hereunder, including closing the sale contemplated herein, are conditioned and contingent on approval by the Bankruptcy Court of this Agreement and the sale of the Property to Buyer.

11.6    <u>Notice of Default/Opportunity to Cure</u>.  Notwithstanding anything contained herein to the contrary, prior to enforcing a remedy available to a party hereunder,

13

such party shall first provide the defaulting party with written notice of the defaulting party's default, such notice to contain reasonable specificity detailing the defaulting party's default, and the defaulting party shall have a period of three (3) business days after the defaulting party's receipt of such notice to cure such default; provided, however, if such default cannot be cured by the defaulting party within such period of time, the defaulting party shall have a reasonable period of time, not to exceed ten (10) days after the defaulting party's receipt of such notice, to cure such default.  After the time periods set forth above have lapsed, the party providing such notice to the defaulting party may enforce such party's remedies hereunder.  Notwithstanding anything herein to the contrary, no cure period shall apply to performance of any obligation of either party to be performed on the Closing.

12.   <u>Notices</u>.  Any notices to be given hereunder shall be given by (i) placing the notice in the United States mail, certified with return receipt requested, properly stamped, (ii) delivered by fax or electronic mail (e-mail) transmission, (iii) delivered by overnight delivery service, or (iv) by personal delivery, in each case addressed to the location shown below or such other addresses as the respective party may direct in writing to the other, or to such address.  Such notice shall be deemed effective (A) two (2) days after such placing in the mail when delivered by U.S. Mail service, (B) on the day actually delivered by an overnight delivery service, (C) upon confirmation of the completion of the fax (electronic or otherwise) when delivered by fax, or (D) upon such personal delivery:

Seller:               _____

With a copies to:     Hoover Slovacek
                      Attn: Melissa Haselden
                      Galleria Tower II
                      5051 Westheimer, Suite 1200
                      Houston, Texas 77056
                      (713) 735-4196 Telephone
                      brown@hooverslovacek.com
                      haselden@hooverslovacek.com

Buyer:                11280 Charles Road LP
                      1218 Webster Street,
                      Houston, Texas 77002
                      Attn: William Van Pelt IV
                      (713) 289-6200
                      bvp4@mccltd.com

With a copies to:     Kasowtiz Benson Torres LLP
                      Attn: Kyung Lee
                      1415 Louisiana St., Suite 2100
                      Houston, Texas 77002
                      (713) 220-8850 Telephone
                      klee@kasoiwtz.com
                      rshannon@kasowitz.com

13.     Entire Agreement.  This Agreement contains all agreements between the parties hereto and any agreement not contained herein shall not be recognized by the parties.  The captions used herein are for convenience only and shall not be used to construe this Agreement. Words of gender shall be construed to include any other gender, and words in the singular number shall include the plural and vice versa unless the context requires otherwise.

14.     Surviving Obligations. Notwithstanding any other term or provision of this Agreement to the contrary, any obligation of a party to this Agreement which is a "Surviving Obligation", and any such other rights, duties or obligations that expressly survive the Closing or termination of this Agreement, shall survive the termination of this Agreement for any reason whatsoever or the Closing.

15.     Governing Law.  This Agreement shall be governed by the laws of the State of Texas and venue shall lie in Harris County, Texas.

16.     Confidentiality.  Buyer acknowledges the information and material Buyer may obtain in its review of the Property is confidential, and Buyer agrees to protect the confidentiality of the information relating to such information and relating to the transaction contemplated herein.  Seller hereby agrees that notwithstanding the foregoing confidentiality agreement, Buyer may disclose information to its attorneys, employees, its agents, its proposed lenders or its proposed investors, to the extent reasonably necessary for such employees, agents, lenders or investors to properly analyze and evaluate the proposed transaction, loan or investment and for such employees and agents to advise Buyer, provided that such parties are bound to the terms of this confidentiality provision of this Agreement, or as required by applicable law or compelled by a governmental authority. Buyer's obligations under this Section shall be a Surviving Obligation under the terms of this Agreement.

17.     Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

18.     Effective Date and Date Hereof.  Any reference in this Agreement to "the date hereof", "Effective Date", the "effective date of this Agreement", "the date of this Agreement" or any similar referral shall refer to the date that a fully executed copy of this Agreement is deposited with the Title Company and acknowledged by the Title Company as received.

19.     Offer and Acceptance.  Buyer acknowledges and agrees that the submission of this Agreement to Buyer shall not and does not constitute an offer to sell the Property.  Buyer and Seller agree that there can be no agreement for the purchase and sale of the Property until all parties hereto have signed, delivered, and accepted this Agreement.

20.     Time of Essence.  Time is of the essence in the performance of the terms of this Agreement.

21.     Assignability.  Buyer shall have the right to assign this Agreement or any of its rights hereunder to any entity (or entities) owned and controlled by Buyer, provided that the assignee (or assignees) shall assume all obligations of Buyer hereunder and provided further that written notice of such assignment is given to Seller at least five (5) business

days prior to Closing.  From and after such assignment, wherever in this Agreement reference is made to Buyer such reference shall mean the assignee(s) who shall succeed to all the rights, duties and obligations of Buyer hereunder.  In the event that any assignment of this Agreement is made by Buyer, then Buyer will immediately provide written notice thereof to Seller. Any attempted assignment except as expressly permitted hereby shall be null and void and of no force or effect.

22.     <u>Counterparts and Faxed Signatures</u>.  This Agreement may be executed in one (1) or more counterparts, each of which when taken together shall constitute but one and the same Agreement. Counterparts bearing facsimile signatures shall be deemed to constitute originals.

23.     <u>Saturday, Sundays and Holidays</u>.  If the time period for any action to be taken pursuant to this Agreement falls on a Saturday, Sunday or Public Holiday the time period for taking such action shall be extended automatically until the next following business day that is not a Saturday, Sunday or Public Holiday. For the purpose of this Section, a Public Holiday shall be one of the public holidays specified in 5 T.X.S.C. §6103(a), as may be amended from time to time.

24.     <u>Disclosures</u>.

      24.1     <u>Title</u>.  Buyer should have an Abstract covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy.

      24.2     <u>Consult your Attorney</u>.  This is intended to be a legally binding contract, READ IT CAREFULLY, if you do not understand the effect of any part of this Agreement contact your attorney before signing.  No representation is made as to the tax consequences of any provision herein in any specific transaction.

25.     <u>1031 Exchange</u>.  Seller and Buyer each agree to cooperate with the other party to facilitate Seller's transfer of the Property and/or Buyer's purchase of the Property as part of a tax-deferred exchange under Section 1031, Internal Revenue Code ("<u>1031 Exchange</u>"), provided that in so cooperating neither party is obligated to incur any additional liability or expense or to agree to any extension of any time limit provided in this Agreement. Any provision of this Agreement to the contrary notwithstanding, either Seller or Buyer may assign its respective interest in this Agreement to a qualified intermediary, trustee, or other similar person (collectively, an "<u>Intermediary</u>") as reasonably required to facilitate such exchange. Seller and Buyer each agree that no Intermediary shall have any liability or obligation pursuant to this Agreement notwithstanding the assignment to such Intermediary of any interest herein, and Seller and Buyer each agree to look exclusively to the other party for performance of the other party's duties and obligations under this Agreement.

26.     <u>Executory Contracts</u>.

      26.1     Seller shall assume and assign to Buyer at the Closing the Assumed Contracts and each shall be deemed Property purchased by Buyer.  Upon entry of the Bankruptcy Court's Order approving the sale of the Property from Seller to Buyer in form

described in Section 35 below (the "<u>Sale Order</u>"), all Assumed Contracts shall be deemed Property.

27. <u>Assumed Liabilities</u>.   BUYER IS NOT EXPRESSLY OR BY IMPLICATION ASSUMING OR AGREEING TO ASSUME OR DISCHARGE ANY LIABILITY OR OBLIGATION OF THE SELLER WHATSOEVER, WHETHER NOW EXISTING OR HEREAFTER INCURRED, INCLUDING ANY LIABILITY OR OBLIGATION RELATING TO THE PROPERTY, THE SELLER'S BUSINESS OR THE SALE OF ANYTHING RELATED TO IT, other than the following express liabilities (the "<u>Assumed Liabilities</u>"), for which Assumed Liabilities Buyer agrees to be solely responsible:

27.1.1 all liabilities relating to the ownership or operation of the Property accruing after the Closing Date;

27.1.2 Seller's liability under any Assumed Contracts, assumed by and assigned to Buyer, if any, which liability arises after the Closing Date; and

27.1.3 all ad valorem property taxes directly attributable to the Property which are levied by the Texas counties in which the Property is located, for the calendar year beginning January 1, 2019, prorated from the Closing Date to end of year 2019 (the "<u>2019 Property Taxes</u>").

28. <u>Excluded Liabilities</u>. Seller shall promptly pay, discharge and perform in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, and shall remain solely and exclusively liable for any liabilities which are not Assumed Liabilities (the "<u>Excluded Liabilities</u>"), including, without limitation:

28.1.1 payments made to or fees and expenses accrued with respect to professionals retained or employed by Seller;

28.1.2 any pre- or post-bankruptcy, priority, tax, or other claims against the Seller, including, *inter alia*, any claims or obligations related to or arising liabilities for funding any pension plan (whether a defined benefit plan or otherwise); and

28.1.3 all Chapter 11 expenses.

29. <u>Pre-Closing Access</u>.  From the Effective Date through the Closing, upon reasonable prior written notice to Seller and in the presence of a representative of Seller if required by Seller, Buyer shall be authorized and entitled, through its financial advisors, legal counsel, accountants, consultants, financing sources and other representatives, (a) to make such investigation of the Property and business and operations of the Seller, and such examination of Seller's books and records, the Property and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records, (b) to contact and to enter into discussions and negotiate with Seller's vendors, suppliers, customers, strategic business partners and other third parties, including governmental authorities, regarding the proposed sale to Buyer and Buyer's potential business relationships with such persons following the Closing, and (c) to be afforded reasonable access during ordinary business hours to Seller's employees, consultants and independent

contractors.  Seller shall furnish to Buyer and its representatives, as promptly as practicable, all other information (other than any information covered by attorney-client or work product privilege not included within the Property) as Buyer or any of such persons may reasonably request in furtherance of the proposed sale to Buyer.  From the Effective Date through the Closing, Seller shall promptly deliver or make available to Buyer and its representatives all notices, statements, schedules, applications, reports and other papers anywhere related to the Debtor's business or the Property.

30.    Cooperation.

    30.1.1  Buyer and Seller agree to execute and deliver all other instruments and take all such other actions that either party may reasonably request from time to time, before or after Closing and without payment of further consideration, to effectuate this Agreement and to confer to the parties the benefits intended by such transactions. The parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement and any of the Closing documents.

    30.1.2  Seller agrees that, following the Closing, it shall provide Buyer and its representatives with such reasonable access to the records, financials and corporate documents retained by Seller as Buyer may reasonably request and to make copies of the same, at Buyer's expense, in connection with (i) the preparation of tax returns or information returns, (ii) reports or other obligations by Buyer to governmental agencies, and (iii) such other matters as Buyer may require.

31.    Employment of Employees.  Buyer may employ, in its sole discretion, any of the current or former employees of Seller. Seller agrees to take no action outside of the ordinary course of business that could reasonably be expected to interfere with such employment by Buyer, and shall take all action required by law or otherwise reasonably requested by Buyer to cause the valid termination of employment at the Closing Date of such employees by Seller who are to be employed by Buyer following the Closing Date.  Nothing in this Agreement is intended to confer upon any employee or former employee of Seller any rights or remedies, including, without limitation, any rights of employment of any nature or kind whatsoever.

32.    Name Change. Seller shall take all corporate and other actions reasonably requested by Buyer to change its corporate name at the Closing Date so that Buyer will have the right to use such name.

33.    Consummation of Transaction. The parties shall each use reasonable efforts to cause the transactions provided for in this Agreement to be consummated once it is approved by the Bankruptcy Court, and, without limiting the generality of the foregoing, shall use reasonable efforts to obtain all necessary approvals, waivers, consents, permits, licenses, registrations and other authorizations required in connection with the Closing documents, including, but not limited to, the Sale Order.

34.  Sale Order.  An order (defined previously as the "Sale Order") approving the sale of the Property pursuant to this agreement shall be entered by the Bankruptcy Court that finds and determines, among other things, that:

34.1  Debtor is authorized to consummate the transactions provided for in this Agreement;

34.2  Buyer is a "good faith purchaser" of the Property including as assignee of the Assumed Contracts, if any, which are not Excluded Assets;

34.3  The Property, including the Assumed Contracts of Seller, will be transferred and assigned free and clear of all transfer restrictions, liens, claims, security interests and other encumbrances of every kind or nature whatsoever, whether arising by agreement, operation of law or otherwise;

34.4  the purchase price for the Property shall be the Purchase Price, as adjusted hereunder to the extent provided herein; and

34.5  Buyer shall not be deemed a successor and shall acquire no successor liability of any kind whatsoever for any obligation of the Seller, or any claims against the Seller or the Property, as a result of the sale of the Property (including assignment of the Assumed Contracts) to Buyer.

35.  Defense of Orders.  Seller shall seek immediate entry of the Sale Order.  Seller shall oppose any application for an order reversing, modifying, staying, enjoining, or restraining the terms or effectiveness of the Sale Order.  Seller shall use its best efforts to defend the Sale Order in the event that Buyer elects, in its sole discretion, to close the purchase and assignment described above notwithstanding the pendency of any motion for reconsideration or appeal of the Sale Order.

36.  Real Estate Commissions.  Neither Seller nor Buyer has contacted any real estate broker, finder or similar person in connection with the transaction contemplated hereby.  **TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, SELLER AND BUYER EACH HEREBY COVENANTS AND AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OTHER FROM AND AGAINST ANY AND ALL CLAIMS FOR REAL ESTATE COMMISSIONS, FEES OR SIMILAR CHARGES WITH RESPECT TO THIS TRANSACTION, ARISING BY, THROUGH OR UNDER THE INDEMNIFYING PARTY AND EACH FURTHER AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OTHER FROM ANY LOSS OR DAMAGE RESULTING FROM AN INACCURACY IN THE REPRESENTATIONS CONTAINED IN THIS SECTION.**  The following disclosure is provided in accordance with applicable law:  Buyer is advised that it should either have the abstract covering the Property examined by an attorney of Buyer's own selection or be furnished with or obtain a policy of title insurance.

37.  Conditions Precedent To Buyer's Obligations.  The obligations of Buyer under this Agreement are subject to satisfaction or fulfillment of the following conditions at or prior to the Closing Date, any one or more of which may be expressly waived in writing by

Buyer in its sole discretion.  In the event such conditions, or any other conditions to Closing set forth in this Agreement, are not satisfied or waived at or prior to Closing, Seller shall be considered in default and Buyer shall have the rights and remedies set forth in Section 12.1 of this Agreement.

37.1   <u>Representations and Warranties</u>.  Each of the representations and warranties of Seller set forth in this Agreement shall be true, complete and correct in all material respects on the Effective Date through the Closing Date.

37.2   <u>Performance of Covenants</u>. Each of the agreements, covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to Closing shall have been duly performed and complied with in all material respects.  Seller shall have delivered each of the documents and other deliverables required to be delivered by Seller pursuant to this Agreement.

37.3   <u>Bankruptcy Court Orders</u>.  The Bankruptcy Court shall have entered a final and non-appealable Sale Order in a form which is satisfactory to Buyer in its reasonable discretion and the Sale Order shall not have been stayed.

37.4   <u>Legal Matters</u>.  The Closing shall not, directly or indirectly (with or without notice or lapse of time or both), violate, contravene, materially conflict with or result in a violation of any law and shall not violate any order or decree of any court or governmental authority of competent jurisdiction, and no legal or administrative proceeding shall have been brought or threatened by any person which questions the validity of legality of this Agreement or any related contemplated transaction.

37.5   <u>Deliveries of Seller</u>. Seller shall have made the deliveries required by Section 6.

37.6   <u>Bankruptcy Matters</u>.  All authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of this Agreement and the transactions contemplated by it shall have been obtained, including but not limited to the entry of the Sale Order by the Bankruptcy Court, and Seller shall have received from the Bankruptcy Court any and all other orders, approvals and consents required to transfer the Property and to consummate the transactions provided for in this Agreement.

[Signatures Appear on Following Page]

EXECUTED by Seller this **6** day of **May**_____, 2019.

**SELLER:**

**ARSHAM METAL INDUSTRIES, INC.,**
a Texas corporation


By: _____
        Name:
        Title:



**BUYER**:

**11280 CHARLES ROAD LP**
a Texas limited partnership


By:  CFG AM GP, LP
Title: General Partner

By: _____
        Name:  William Van Pelt, IV
        Title:   President of General Partner

RECEIPT OF AGREEMENT

      Receipt of the foregoing Agreement is hereby acknowledged on the ____ day of _____, 2019. The foregoing date shall be the Effective Date as referred to in the Agreement.

**STEWARD TITLE GUARANTY COMPANY**


By:_____
        Name:
        Title:

RECEIPT OF EARNEST MONEY

      Receipt of the Earnest Money is hereby acknowledged on the ___ day of _____, 2019.  The undersigned shall hold the Earnest Money in accordance with the terms of this Agreement.

                              **STEWARD TITLE GUARANTY COMPANY**

                              By:_____
                                    Name:
                                    Title:

<u>EXHIBITS</u>:

Exhibit "A" - Legal Description
Exhibit "B" – Special Warranty Deed
Exhibit "C" – Assignment and Assumption
Exhibit "D" – Bill of Sale

EXHIBIT "A"

## LEGAL DESCRIPTION

LOT 36-B, OF FAIRVIEW GARDEN, LOT 36B PARTIAL REPLAT, A SUBDIVISION IN HARRIS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN FILM CODE NO. 458013 OF THE MAP RECORDS OF HARRIS COUNTY, TEXAS.

<u>EXHIBIT "B"</u>

<u>AFTER RECORDING RETURN TO</u>:

_____

_____

_____

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**SPECIAL WARRANTY DEED**

| | |
|---|---|
| STATE OF TEXAS | § |
| | §    KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF HARRIS | § |

THAT **ARSHAM METAL INDUSTRIES, INC.**, a Texas corporation ("<u>Grantor</u>"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to it paid by _____, a _____ ("<u>Grantee</u>"), the receipt and sufficiency of which are hereby acknowledged and confessed by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does hereby GRANT, BARGAIN, SELL and CONVEY unto Grantee the tract of land lying and being situated in Houston, Harris County, Texas, as more particularly described on <u>Exhibit "A"</u> attached hereto and incorporated herein for all purposes (the "<u>Land</u>"), together with (a) all buildings, structures, fixtures and improvements situated on, in or under the Land (the "<u>Improvements</u>"), and (b) all of Grantor's right, title and interest in and to the appurtenances pertaining to the Land (hereinafter collectively referred to as the "<u>Appurtenant Property</u>"), including, but not limited to, all right, title and interest of Seller in and to adjacent roads, rights-of-way, alleys, drainage facilities, easements and utility facilities and strips and gores between the described Land and abutting properties, if any.  The Land, Improvements, and Appurtenant Property are sometimes hereinafter referred to as the "<u>Property</u>".

This conveyance is made and accepted free and clear of all liens, claims, encumbrances, and interests pursuant to that certain "Sale Order" dated _____, 2019 and entered as Docket No. _____ in Case No. 19-31268-H2-11 in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division, and is subject to the exceptions set forth on <u>Exhibit "B"</u>, attached hereto and made a part hereof for all purposes (the "<u>Permitted Exceptions</u>").

TO HAVE AND TO HOLD THE PROPERTY, together with all and singular the rights and appurtenances belonging in any way to the Property, subject to the provisions stated herein, to Grantee, Grantee's successors and assigns forever, and Grantor binds itself and its legal

{851329/00130/01312984.DOCX 1 }                                    B-1

representatives and successors TO WARRANT AND FOREVER DEFEND all and singular the Property to Grantee and Grantee's successors and assigns against every person lawfully claiming or to claim all or any part of the Property by, through, or under Grantor, but not otherwise.

**AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT: (i) GRANTEE HAS CONDUCTED ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF ALL ASPECTS OF THE PROPERTY, (ii) OTHER THAN AS EXPRESSLY SET OUT HEREIN OR IN THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED _____ ____, 2019, BY AND BETWEEN GRANTOR AND GRANTEE ("<u>PURCHASE AGREEMENT</u>"), GRANTEE IS NOT RELYING ON ANY REPRESENTATIONS OR STATEMENTS OF GRANTOR OR ITS AGENTS, (iii) GRANTEE IS RELYING ON SUCH INDEPENDENT INVESTIGATION AND INSPECTION AND IS NOT RELYING ON ANY INFORMATION PROVIDED BY GRANTOR, GRANTOR'S ENGINEERS OR THE BROKERS IN DETERMINING WHETHER TO PURCHASE THE PROPERTY, (iv) CERTAIN INFORMATION PROVIDED BY GRANTOR TO GRANTEE WITH RESPECT TO THE PROPERTY HAS BEEN OBTAINED FROM A VARIETY OF SOURCES AND THAT GRANTOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION, (v) GRANTEE IS FULLY AND COMPLETELY SATISFIED THAT THE PROPERTY IS SATISFACTORY IN ALL RESPECTS FOR GRANTEE'S INTENDED USE AND (vi) GRANTEE HAS NO RECOURSE WHATSOEVER AGAINST GRANTOR OR THE BROKER IN CONNECTION WITH THE PROPERTY OTHER THAN FOR ANY VIOLATIONS AS TO THE WARRANTIES AND COVENANTS OF GRANTOR CONTAINED HEREIN OR IN THE PURCHASE AGREEMENT.**

**AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT: (i) EXCEPT FOR THE SPECIAL WARRANTY SET OUT HEREIN OR THE EXPRESS REPRESENTATIONS SET OUT IN THE PURCHASE AGREEMENT, GRANTOR HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY, INCLUDING BUT NOT LIMITED TO: (A) THE NATURE, QUALITY, OR CONDITION OF THE PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH GRANTEE MAY CONDUCT THEREON IN THE FUTURE; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, INCLUDING, BUT NOT LIMITED TO, ANY STATE OR FEDERAL ENVIRONMENTAL LAW, RULE OR REGULATION; (E)THE HABITABILITY, MERCHANTABILITY, OR FITNESS OF THE PROPERTY FOR A PARTICULAR PURPOSE; OR (F) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY (COLLECTIVELY, THE "<u>DISCLAIMED MATTERS</u>"). GRANTEE HEREBY WAIVES ANY SUCH OTHER REPRESENTATION, WARRANTY, PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES.**

AS A MATERIAL PART OF THE CONSIDERATION FOR THIS DEED, GRANTEE ACKNOWLEDGES AND AGREES THAT EXCEPT FOR THE SPECIAL WARRANTY CONTAINED HEREIN OR AS EXPRESSLY SET OUT IN THE PURCHASE AGREEMENT, GRANTOR IS CONVEYING THE PROPERTY TO GRANTEE "AS IS", "WHERE IS", AND WITH ALL FAULTS AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS, OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE GRANTOR.

WITHOUT IN ANY WAY LIMITING ANY PROVISION OF THE FOREGOING, GRANTEE SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD OR MAY HAVE AGAINST GRANTOR AND GRANTOR'S PARTNERS, OFFICERS AND AGENTS WITH RESPECT TO (i) THE DISCLAIMED MATTERS, (ii) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (iii) THE PAST, PRESENT OR FUTURE CONDITION OR COMPLIANCE OF THE PROPERTY WITH REGARD TO ANY ENVIRONMENTAL PROTECTION, POLLUTION CONTROL OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980 (HEREIN CALLED "CERCLA"), AND (iv) ANY OTHER STATE OF FACTS THAT EXISTS WITH RESPECT TO THE PROPERTY; PROVIDED, HOWEVER, THE FOREGOING WAIVER, RELEASE AND DISCHARGE DOES NOT WAIVE, RELEASE, OR DISCHARGE ANY CLAIM GRANTEE MAY HAVE AGAINST GRANTOR UNDER THE SPECIAL WARRANTY SET FORTH IN THIS DEED OR FOR BREACH OF THE EXPRESS REPRESENTATIONS (DURING THE PERIOD FOR WHICH SUCH EXPRESS REPRESENTATIONS SURVIVE) SET FORTH IN THE PURCHASE AGREEMENT.

Current ad valorem taxes, assessments and fees relating to or pertaining to the Property, having been prorated to the date hereof, the payment thereof is hereby assumed by Grantee.

The mailing address of Grantee is set forth below:

_____
_____


[Signatures Appear on Following Page]

IN WITNESS WHEREOF, Grantor has caused this Deed to be executed on this _____ day of _____, 20__.

**GRANTOR:**

**ARSHAM METAL INDUSTRIES, INC.,**
a Texas corporation

By: _____
[Name, Title]

| STATE OF TEXAS | § |
|---|---|
| | § |
| COUNTY OF HARRIS | § |

The foregoing was acknowledged before me on the _____ day of _____, 20__, by [NAME, TITLE] of **ARSHAM METAL INDUSTRIES, INC.**, in such capacity.

_____
Notary Public, State of Texas

EXHIBIT "A"

**LEGAL DESCRIPTION**

LOT 36-B, OF FAIRVIEW GARDEN, LOT 36B PARTIAL REPLAT, A SUBDIVISION IN HARRIS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN FILM CODE NO. 458013 OF THE MAP RECORDS OF HARRIS COUNTY, TEXAS.

EXHIBIT "C"

## ASSIGNMENT AND ASSUMPTION

WHEREAS, concurrently with the execution and delivery hereof, **ARSHAM METAL INDUSTRIES, INC.,** a Texas corporation ("Assignor"), is conveying to _____, a _____ ("Assignee"), by Special Warranty Deed, that certain tract of land situated in Harris County, Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof by reference (the "Land"), together with (a) all buildings, structures, fixtures and improvements situated on, in or under the Land (the "Improvements"), and (b) all of Grantor's right, title and interest in and to the appurtenances pertaining to the Land (collectively, the "Appurtenant Property"), including, but not limited to, all right, title and interest of Seller in and to adjacent roads, rights-of-way, alleys, drainage facilities, easements and utility facilities and strips and gores between the described Land and abutting properties, if any.  The Land, Improvements, and Appurtenant Property are sometimes hereinafter referred to as the "Real Property".

WHEREAS, concurrently with the execution and delivery hereof,  Assignor is conveying to Assignee, by Bill of Sale,  the personal property owned by Assignor, including, without limitation, all inventory, furniture, furnishings, fixtures, fittings, appliances, apparatus, equipment, tools, machinery, maintenance supplies, heating, ventilating, air-conditioning, incinerating, lighting, plumbing and electrical fixtures, hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment, contract rights, claims, systems, names, "doing business as" names, goodwill, trademarks, websites, domain names, e-commerce names, social media accounts, email addresses, telephone numbers, facsimile numbers, logos, customer information, vendor information, books, records, files and other items of tangible and intangible personal property (collectively, the "Personal Property").  The Real Property and the Personal Property are sometimes referred to as the "Property".

WHEREAS, in connection with the sale of the Property, Assignor desires to assign to Assignee, and Assignee desires to obtain by assignment from Assignor and to assume all obligations of Assignor thereunder, all of the Assigned Contracts (as defined below).

NOW, THEREFORE, in consideration of the premises and the conditions set forth below, and the payment of TEN and NO/100 DOLLARS ($10.00), the receipt and sufficiency of which is hereby expressly acknowledged, Assignor has ASSIGNED, and by these presents does hereby ASSIGN unto Assignee, and Assignee accepts from Assignor, all of Assignor's right, title, and interest in and to the following, as more particularly described on Exhibit "B" attached hereto and made a part hereof by reference (the "Assigned Contracts"), in each case, to the extent transferable, to wit:

1. any and all rights to sanitary sewer wastewater capacity, water and storm drainage, and other utilities serving the Land and the Improvements;

2. any and all transferable or assignable permits and licenses owned by Assignor and in any way related to the Property;

3.  any and all transferable or assignable dealer, manufacturer, builder, or other warranties pertaining in any way to the Improvements or any Personal Property, except for any of Assignor's personal items, if any; and

4.  any other Assigned Contracts set forth on Exhibit "B" attached hereto.

TO HAVE AND TO HOLD the Assigned Contracts unto Assignee and Assignee's successors and assigns forever; and Assignor does hereby bind Assignor and its successors and assigns to WARRANT AND FOREVER DEFEND, all and singular the title in and to said Assigned Contracts unto the said Assignee and Assignee's successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor, but not otherwise.

As a material part of the consideration for this Assignment and Assumption, Assignee acknowledges and agrees that Assignor is conveying the Assigned Contracts described above to Grantee "AS IS", "WHERE IS" and with all faults and specifically and expressly without any warranties, representations, or guarantees, either express or implied, of any kind, nature or type whatsoever from or on behalf of the Assignor, except as expressly set forth herein or in the Agreement.

Assignee expressly accepts and assumes all right, title, interest, obligation, and liability in, to or under the Assigned Contracts arising or accruing from and after the date hereof, and Assignor shall have no further covenant, duty, obligation, or responsibility under the Assigned Contracts arising or accruing on and after the date hereof.

**ASSIGNOR, TO THE FULLEST EXTENT PERMITTED BY LAW, SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS ASSIGNEE, AND ANY OF ITS PAST, PRESENT, OR FUTURE PARTNERS, MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS, REPRESENTATIVES, SUCCESSORS, AND ASSIGNS, OR ANY SUBSIDIARY, AFFILIATE, OR PARENT THEREOF, FROM AND AGAINST ANY AND ALL THIRD PARTY CLAIMS, DEMANDS, CAUSES OF ACTION, CHARGES, JUDGMENTS, DAMAGES, LIABILITIES, COSTS, OR EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COURT COSTS) ARISING OUT OF, RESULTING FROM, RELATING TO, OR IN CONNECTION WITH THE ASSIGNED CONTRACTS IN CONNECTION WITH EVENTS ARISING, ACCRUING, OR OCCURRING PRIOR TO THE DATE HEREOF. ASSIGNEE SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS ASSIGNOR, AND ANY OF ITS PAST, PRESENT, OR FUTURE PARTNERS, MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS, REPRESENTATIVES, SUCCESSORS, AND ASSIGNS, OR ANY SUBSIDIARY, AFFILIATE, OR PARENT THEREOF, FROM AND AGAINST ANY AND ALL THIRD PARTY CLAIMS, DEMANDS, CAUSES OF ACTION, CHARGES, JUDGMENTS, DAMAGES, LIABILITIES, COSTS, OR EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COURT COSTS) ARISING OUT OF, RESULTING FROM, RELATING TO, OR IN CONNECTION WITH THE ASSIGNED**

**CONTRACTS IN CONNECTION WITH EVENTS ARISING, ACCRUING, OR OCCURRING ON OR AFTER THE DATE HEREOF.**

This Assignment and Assumption and the provisions herein contained shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

This Assignment and Assumption may be executed in multiple counterparts which when taken together shall constitute an original.

*[Remainder of Page Intentionally Left Blank.  Signature Page to Follow.]*

IN WITNESS WHEREOF, the parties have executed this instrument this _____ day of _____, 2019.

**ASSIGNOR**:

**ARSHAM METAL INDUSTRIES, INC.,**
a Texas corporation

By: _____
     Name:
     Title:

**ASSIGNEE**:

_____,
a _____

By: _____
     Name:
     Title:

EXHIBIT "A"

**LEGAL DESCRIPTION**

EXHIBIT "D"

**BILL OF SALE**

**ARSHAM METAL INDUSTRIES, INC.,** a Texas corporation ("Grantor"), has heretofore entered into a Purchase and Sale Agreement, dated effective _____, 2019 (the "Agreement"), with _____, a _____ ("Grantee"), for the sale of certain real and personal property of Grantor to Grantee.

WHEREAS, it is the desire of Grantor to assign, transfer and convey to Grantee, pursuant to the Agreement, all personal property set forth on Exhibit "A" attached hereto of, together with all of Grantor's right, title and interest in any other personal property owned by Grantor, including, without limitation, all inventory, furniture, furnishings, fixtures, fittings, appliances, apparatus, equipment, tools, machinery, maintenance supplies, heating, ventilating, air-conditioning, incinerating, lighting, plumbing and electrical fixtures, hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment, contract rights, claims, systems, names, "doing business as" names, goodwill, trademarks, websites, domain names, e-commerce names, social media accounts, email addresses, telephone numbers, facsimile numbers, logos, customer information, vendor information, books, records, files and other items of tangible and intangible personal property (collectively hereinafter referred to as the "Personal Property"), but expressly excluding the personal property set forth on Exhibit "B" attached hereto.

NOW THEREFORE, in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00), in hand paid by Grantee to Grantor and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Agreement, Grantor does hereby TRANSFER, ASSIGN AND DELIVER, to Grantee the Personal Property, excepting and excluding the Excluded Personal Property, free and clear of all liens, claims, encumbrances and interest, pursuant to that certain "Sale Order" dated _____, 2019 and entered as Docket No. _____ in Case No. 19-31268-H3-11 in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division.

TO HAVE AND TO HOLD the Personal Property unto Grantee, its successors and assigns, forever, and Grantor does hereby bind itself, its successors and assigns, to WARRANT and FOREVER DEFEND, all and singular, title to the personal property described on Exhibit "A" unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through, or under Grantor, but not otherwise.

As a material part of the consideration for this Bill of Sale, Grantee acknowledges and agrees that Grantor is conveying the Personal Property described above to Grantee "AS IS", "WHERE IS" and with all faults and specifically and expressly without any warranties, representations, or guarantees, either express or implied, of any kind, nature or type whatsoever from or on behalf of the Grantor, except as expressly set forth herein or in the Agreement.

[Signature Page follows]

EXECUTED effective this _____ day of _____, 20__.

**GRANTOR:**

**ARSHAM METAL INDUSTRIES, INC.,**
a Texas corporation

By: _____
      Name, Title

SCHEDULE 1.2(a)

**EXCLUDED PERSONAL PROPERTY**

1  **2014 Cat M322D Material Handler with Grapple**
2  **All cash, accounts receivable, and bank accounts of Seller.**

SCHEDULE 1.2(b)

**PERSONAL PROPERTY**

1  **[Intentionally Omitted]**
2  **2018 Ford Truck**
3  **Automobile (2 Work Trucks)**
4  **2008 Colmar Baler W/ Crane B5000**
5  **1980 Streeter Amet Truck Scale**
6  **DPS Software**
7  **Fixed Assets – Seller to identify**
8  **Mansel Furnace**
9  **Office Equipment, Supplies, Safety Supplies, Safety Equipment, Maintenance Tools, & Furniture**
10 **Micropulse Baghouse**
11 **2012 Al-Jon Baler with Material Handler**
12 **Complete Furnace System - 55,000 LB Cap 375 CU. FT Furnace Control Room "De-Ox" Conveyance System Dross Tumbler Wheelabrator Pulse Jet Bag House also including auxiliary equipment including but not limited to Lime Feed System and electrical components**
13 **Sennebogan Crane 821M**
14 **Complete Spectrograph (Manufacturer Spectro)**
16 **Rolloff Boxes (Approximately Qty: 2) and Hoppers (Approximately Qty 30)**
17 **Volvo Front End Loader**
18 **Software Licenses and Hardware including Username and Passwords (PLC Controls, Scrap Management and Accounting Software)**
19
   **Any and All Processing Tools Onsite per Inspection**
20 **Various Brand Platform Scales - Quantity 3**
21 **Harris Downstroke Baler**
22 **Niton XL2 980 Gold Alloy Analyzer**
23 **Pyrtotek 1 Ton Molds with Conveyor System**
24 **Toyota Forklifts - Qty Six - All 2016**
25 **Caterpilar Forklift PD8000D w/ Cascade**

<u>SCHEDULE 7.4</u>

**ASSUMED CONTRACTS**

| *Contract Counterparty* | *Description of Contract or Lease* |
|---|---|
| Air Products & Chemicals<br>PO Box 71220<br>Mail Code 5701<br>Charlotte, NC 28272 | Requirements contract for Oxygen |

# EXHIBIT 2

### CURE AMOUNT SCHEDULE

| Contract Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|
| Air Products & Chemicals<br>PO Box 71220<br>Mail Code 5701<br>Charlotte, NC 28272 | Requirements Contract<br>For Oxygen | $4,433.11 |